```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE EASTERN DISTRICT OF TEXAS
 2                             TYLER DIVISION

 3   TINNUS ENTERPRISES, LLC,    )(    CIVIL DOCKET NO.
     ET AL                       )(    6:16-cv-33
 4           - VS -              )(
                                 )(    TYLER, TEXAS
 5   TELEBRANDS CORPORATION,     )(    NOVEMBER 14, 2017
     ET AL                       )(    1:46 P.M.
 6

 7                       TRANSCRIPT OF JURY TRIAL
                            AFTERNOON SESSION
 8        BEFORE THE HONORABLE JUDGE ROBERT W. SCHROEDER III
                       UNITED STATES DISTRICT JUDGE
 9

10   APPEARANCES:

11

     FOR THE PLAINTIFFS:
12
     Thomas M. Dunlap
13   Dunlap Bennett & Ludwig PLLC
     211 Church Street, SE
14   Leesburg, VA 20175

15
     Eric H. Findlay
16   Debby Gunter
     Findlay Craft, P.C.
17   102 N. College Ave., Suite 900
     Tyler, TX 75702
18

19   Brian M. Koide
     Dunlap Bennett & Ludwig PLLC
20   8300 Boone Blvd. #550
     Vienna, VA 22182
21

22   Cortland C. Putbrese
     Dunlap Bennett & Ludwig PLLC
23   2307 East Broad Street, Ste. 301
     Richmond, Virginia 23223
24

25
```

```
 1   FOR THE PLAINTIFFS:

 2   Kelly J. Kubasta
     Ferguson Braswell & Fraser, P.C.
 3   2500 Dallas Parkway, Suite 501
     Plano, Texas 75093
 4

 5   FOR THE DEFENDANT:

 6   Michael Underhill
     Eric Maurer
 7   Stacey Grigsby
     William Bloom
 8   Boies Schiller & Flexner LLP
     1401 New York Avenue, NW
 9   Washington DC 20005

10
     Robert Maldonado
11   Elana Araj
     Laura Alos
12   Cooper & Dunham
     30 Rockefeller Plaza
13   New York, New York 10112

14
     Lance Lee
15   Attorney at Law
     5511 Plaza Drive
16   Texarkana, TX 75503

17
     Gregory Love
18   Love Law Firm
     107 E. Main Street
19   Henderson, TX 75652

20
     COURT REPORTER:          Shelly Holmes, CSR-TCRR
21                            Federal Official Reporter
                              100 E. Houston Street
22                            Marshall, Texas  75670
                              (903) 923-7464
23
     (Proceedings recorded by mechanical stenography, transcript
24   produced on a CAT system.)

25
```

```
 1                    P R O C E E D I N G S
 2          (Jury out.)
 3          THE COURT:  Be seated.
 4          Okay.  I've taken a look at 1.12 and 1.23, I'm
 5  going to sustain the Plaintiffs' objections to those slides.
 6          So I won't permit those to be used in openings.
 7          Anything before we have the jury brought in?
 8          MR. DUNLAP:  Nothing from the Plaintiff, Your
 9  Honor.
10          MR. LEE:  No, Your Honor.
11          THE COURT:  Okay.  Let's have the jury brought in.
12          COURT SECURITY OFFICER:  All rise for the jury.
13          (Jury in.)
14          THE COURT:  Please be seated.
15          Welcome back, ladies and gentlemen of the jury.
16          You have now been sworn as the jury that will try
17  this case.  And I'm going to give you some preliminary
18  instructions and tell you a little about -- a little bit
19  about what to expect during the course of the next five to
20  six days.
21          And then following that, the attorneys will have an
22  opportunity to present their opening statements to you.
23          As the jury, it will be your responsibility to
24  decide disputed questions of fact.  As the Judge, I will
25  decide all questions of law and procedure.
```

1        From time to time, during the course of the trial,

2   and then, again, at the end of the trial, I will instruct

3   you on the rules of law that you must follow in making your

4   decision.

5        As I said, very soon, the attorneys will present

6   their opening statements to you.  Opening statements are

7   intended to assist you in understanding the evidence.

8        However, what the lawyers say during opening

9   statements is not evidence.  It's only what they expect the

10  evidence will show.

11       What you should base your decision on is the

12  evidence that you will hear and that comes into evidence

13  from the witness stand by deposition and from the exhibits

14  that I admit into evidence.

15       You will rely on this evidence in making your

16  decision as to the verdict in this case.

17       The party who brings a lawsuit is called the -- the

18  Plaintiff.  And the Plaintiffs in this case are Tinnus

19  Enterprises, LLC, and ZURU Ltd.  These parties will be

20  referred to throughout the trial as the Plaintiffs.

21       The party against whom a suit is brought is called

22  the Defendant.  In this case, the Defendants are Telebrands

23  Corporation, Bulbhead.com, LLC, Bed Bath & Beyond Inc.,

24  Fry's Electronics, The Kroger Company, Sears Holding

25  Corporation, and Walgreens Boots Alliance, Inc., all of whom

1  will be referred to as the Defendants.

2          As I told you during voir dire, this is a case of

3  alleged patent infringement.  After the opening statements,

4  the Plaintiffs will call witnesses and present evidence.

5  Then the Defendants will have an opportunity to call

6  witnesses and present evidence.

7          After the parties' main cases are completed, the

8  Plaintiffs may be permitted to present what we call rebuttal

9  evidence.  After all of the evidence is in, I will instruct

10  you on the applicable law.  I will give you detailed

11  instructions, both orally, as I'm doing now, and at the end

12  of the case, you'll have written instructions to take with

13  you to the jury room.

14          After I have given you your final instructions,

15  after all of the evidence is in and after you have heard the

16  final instructions, then you will hear the closing arguments

17  of the attorneys.

18          After you have heard their closing arguments, then

19  and only then will you retire to the jury room, start to

20  discuss the case, deliberate, and reach a verdict.

21          During the case, I want you to keep an open mind.

22  You should not decide any fact until you have heard all of

23  the evidence and then closing arguments and then my

24  instructions.

25          You should pay close attention to the testimony

1  that comes from the witness stand and the evidence that is

2  admitted in the form of documentary or other evidence.

3           If you would like to take notes during the trial,

4  you may do so.  A notepad and a pen have been provided for

5  your convenience.  And I would suggest that you write your

6  name on the first page there or somewhere on the cover at

7  this time.

8           Everything that you write in that notebook will be

9  confidential.  And at the end of the case, we will shred it.

10          If you decide to take notes in the case, I do want

11  to ask you not to get so involved in your note taking that

12  you become distracted and miss part of the testimony.  You

13  don't have to write everything down that happens, but just

14  take such notes as you feel are appropriate or would be

15  helpful to you.

16          Your notes really are to be used only as an aid to

17  your memory.  And if your memory later is different from

18  what you have written in your notes, you should rely on your

19  memory and not on your notes.

20          Just because something gets written down on the

21  notepad doesn't make it any more important than your

22  recollection or another juror's recollection.  So you should

23  not be unduly influenced by the notes that others take.

24          A jurors' notes are not entitled to any greater

25  weight than the recollection of each juror concerning the

1    testimony.

2           Even though we have a court reporter, who is

3    present, Ms. Holmes, who will be making stenographic notes

4    of what's said in the court, a typewritten copy of the

5    testimony will not be available for your use during

6    deliberations.

7           On the other hand, any exhibits that are introduced

8    into evidence and used during the trial, those would be

9    documents or physical evidence, they will be available for

10   you during your deliberations.

11          As I mentioned before we broke for lunch, my next

12   instruction is very important.  Until the trial is over, do

13   not discuss this case with anyone, and do not permit it to

14   be discussed in your presence.  This does include your

15   family and your friends.

16          You should not even discuss the case with your

17   other jurors until all of the jurors are in the jury room at

18   the end of the case.

19          So when you go to lunch or we break in the

20   evenings, y'all feel free to talk about anything you want

21   to, just don't talk about the case.

22          Likewise, you should hold yourself completely apart

23   from any discussion that anybody is having until we get to

24   the end of the case.  Obviously, if someone were to attempt

25   to discuss the case with you, I would want you to let me

1  know that.

2          You should also -- during the course of the trial,

3  as you are in the courthouse, you will see the attorneys,

4  you will see the witnesses, you will see people who are here

5  assisting the attorneys.

6          You should hold yourself completely apart from all

7  the people involved in the case.  When you get here in the

8  morning, feel free to go around to the head of the line

9  and -- so you can avoid standing next to any of the parties

10  or any of the witnesses.

11          It is obviously important for you to be fair and

12  impartial in this case, and it's also important for you to

13  appear to be fair and impartial.  And that's why you

14  shouldn't have any contact with any of them.

15          The attorneys here are good attorneys, and they

16  know the rules of the court, so they won't -- they won't try

17  to talk to you.  And when they don't try to talk to you,

18  they're not trying to be rude or impolite or anything of

19  that nature.  They're just following my instructions to them

20  not to -- not to talk to you.

21          As far as discussing the case with others, as I

22  mentioned before we broke for lunch, if you have any type of

23  social networking platform or site like Facebook or Twitter

24  or Instagram or Snapchat or anything like that, please don't

25  do any posting of updates on any of those sites.  Don't

1    update -- you know, status of updates on Facebook or

2    tweeting on Twitter or anything like that.

3        Likewise, don't send or receive text messages about

4    the case.  That would be entirely improper.

5        And the reason I ask you not to do any of that is

6    if you were to do that, it could result in a great waste of

7    all of the time and the expense and the effort that all of

8    the attorneys and the parties and the witnesses have

9    expended getting this case ready for trial.

10        When you retire to the jury room at the end of the

11   case, after all of the evidence is in, after all of the

12   documents have been submitted, after you've heard the

13   witnesses testify, my instructions on the law, and the

14   attorney's closing arguments to you, that is what you will

15   base your decision on, not something else.  And I would ask

16   that you follow those instructions very, very carefully.

17        Likewise, don't make any investigation, any

18   independent investigation of any fact or matter in this

19   case.  Don't try to learn anything about the case from any

20   outside source.  And that is important for the very reason I

21   just described.

22        Potentially, you could put at risk all of the

23   expense and effort that has gone into this case if you were

24   to do that.

25        The decision that you will make in the case should

 1   only be based on what's learned in this courtroom and from

 2   no other source.

 3          So as I said, if you see something on television or

 4   read something in the newspaper, just change the channel,

 5   don't read the article.  It's very important for you not to

 6   go to any other source for any information about this case.

 7          Likewise, don't Google the parties or the attorneys

 8   or anything about the case.  Don't go home and try to get on

 9   your computer and start doing any sort of investigation.

10          During the trial, it may be necessary for me to

11   confer with the lawyers out of your hearing or make or

12   conduct some part of the trial outside of your presence.

13          I will handle these matters as briefly and as

14   conveniently for you as I can.  We will meet over lunch.  We

15   will meet before you arrive here in the morning.  We will

16   meet at the end of the day after you have gone home.

17          And I can assure you, we will all do our best to

18   hold down any time that you're spent -- that you spend in

19   the jury room, instead of out -- out here listening to

20   testimony to -- to the very bare minimum.

21          There will be times during the course of the trial,

22   as there always are, where there is some matter that must be

23   discussed outside of your presence, and we'll perhaps be up

24   here at the bench discussing something outside of your

25   presence.

1        And you're going to be wondering, you know, why is

2   it we are sitting here?  What's going on?  I would ask for

3   you to recognize that's just part of the case, but we will

4   do our very best to hold that to a minimum.

5        In terms of our trial schedule, we will start

6   promptly at 9:00 o'clock every morning.  I will ask you to

7   be here no later than 8:45 so that we can get you settled

8   and situated.  And we'll have you in the courtroom at 9:00

9   o'clock with a witness on the witness stand and an attorney

10  at podium ready to go.

11       We'll break one time mid-morning for 10 to 15

12  minutes.  We'll break for an hour, probably, and 15

13  minutes, for lunch.  We'll take an afternoon break

14  somewhere between 3:00 and 3:30.  And then we will recess

15  some time between 5:00 and 5:30 in the evenings.

16       So that is what our trial schedule will hold.

17       Let me explain to you now a little bit about the

18  parties and the nature of the case.

19       As you know, this is a patent case, and the case

20  involves two patents identified by their numbers as follows:

21  U.S. Patent No. 9,249,749 (sic), which is referred to as the

22  '749 patent, and U.S. Patent No. 9,315,282, referred to as

23  the '282 patent.

24       The Plaintiffs contend that Defendants' Battle

25  Balloons infringe Claim 1 of the '749 patent and Claims 1

1    through 3 of the '282 patent.

2           Collectively, we refer to these as the

3    patents-in-suit.  And the claims are referred to as the

4    asserted claims.

5           The Plaintiffs contend that the Defendants have

6    directly infringed the asserted claims of the '749 patent

7    and the '282 patent by making, using, selling, or offering

8    for sale the Battle Balloons in the United States.

9           The Plaintiffs additionally contend that the

10   infringement of the patents-in-suit has been willful.

11          The Defendants deny that they have infringed the

12   asserted claims of the patents-in-suit.  They also deny that

13   any infringement has been willful.

14          I lost our audio for some reason.

15          COURTROOM DEPUTY:  We did.  We lost everything.

16          THE COURT:  Mr. Trombetta?

17          Okay.  We're going to go ahead and proceed.  I --

18   I'll just raise my voice.  Can everybody on the jury hear

19   me?  And we'll try to fix the -- the technical problems

20   before we begin -- begin the -- the -- the opening

21   statements.

22          The Defendants deny that the infringement has been

23   willful, and they also deny that the Plaintiffs are entitled

24   to any damages.

25          The Defendants also contend that the asserted

1  claims are invalid because they are rendered obvious by the

2  prior art under 35 U.S.C. Section 103.

3        The Defendants contend that at the time of the

4  alleged invention, prior art existed that disclosed every

5  element of the asserted claims.

6        Finally, the Defendants contend the '282 patent is

7  invalid for lack of written description.

8        Now, all of that may sound like -- I think we have

9  it back -- all of that may sound like Greek to you right

10  now.  It is a lot of words to be thrown at you.  I'm going

11  to define a lot of these words as we go through the

12  instructions.  And the attorneys, I'm sure, will discuss

13  them in their opening statements.

14        The witnesses will help you understand those words,

15  so I don't want you to feel overwhelmed at this stage.

16  You're going to get a lot of education this week and a lot

17  of help from the attorneys and from the witnesses on both

18  sides.

19        Now, I think before jury selection this morning,

20  you saw a video that provided a good overview of the U.S.

21  patent system and how it works.  The United States

22  Constitution empowers the United States Government to enact

23  patent laws and issue patents to protect inventions.

24        The purpose of the patent system is to help advance

25  science and technology.  The patent system achieves this

purpose by granting to the owner of a patent the right for the life of the patent to exclude any other person from making, using, offering for sale, or selling anywhere in the United States the invention covered by the patent.

Now, a patent has a life for a limited amount of time, which for the parties involved in this case has not yet ended.  Once a patent expires, the invention becomes part of what we call the public domain, which means anyone is free to use it, and the patent owner may no longer exclude from making use of the invention claimed in the patent.

During the term of the patent, however, if another person without the patent owner's permission makes, uses, sells, or offers to sell something that is covered by the claims of the patent, then that person is said to infringe the patent.

The patent owner may enforce a patent against persons or companies believed to be infringers in a lawsuit in federal court, as in this case.

Now, everyone, however, has the right to use existing knowledge and principles.  A patent cannot remove from the public the ability to use what was known or obvious before the invention was made or patent protection was sought.

Thus, to be entitled to patent protection, an

1    invention must be new, useful, and non-obvious.

2         To obtain a patent, the applicant must file a

3    patent application with the United States Patent Office.

4         After the applicant files a patent application, a

5    patent examiner examines the application to determine

6    whether the invention described in the patent application

7    meets the requirements of the patent laws for patentable

8    inventions.

9         If the examiner concludes that the legal

10   requirements for a patent have all been satisfied, he or she

11   allows the claims, and the application issues as a patent.

12        The process from the filing of the patent

13   application to the issuance of the patent is what we call

14   patent prosecution.

15        The record of the papers related to the patent

16   prosecution is referred to as the prosecution history or the

17   file history.

18        The granting of a patent by the Patent Office

19   carries with it the presumption that the patent is valid.

20        From the issuance of a patent, it is presumed that

21   its subject matter is new, useful, and constitutes an

22   advance that was not, at the time the invention was made,

23   obvious to one of ordinary skill in the art.

24        However, that presumption may be rebutted at trial,

25   and you, the finder of fact, may find the patent to be

1   invalid.

2          Now, you have been provided with copies of the

3   patents-in-suit in your notebooks.

4          If you would, look at the cover page of the '749

5   patent.

6          You'll see on the first page it provides

7   identifying information.  And it will have the date there

8   where the patent issued, and the patent number is along the

9   top, as well as the inventor's name, the filing date, and a

10  list of the prior art publications that was considered by

11  the Patent Office when deciding whether to issue the patent.

12         Next, you will see what is called the abstract,

13  which is a brief statement about the subject matter of the

14  invention.

15         And then you'll see on the next several pages of

16  the patent, there are drawings, and those appear as

17  Figures 1 through 8.

18         The drawings depict various aspects or features of

19  the invention.  And those are described in words later in

20  the patent.

21         So the written description of the invention appears

22  next.  And it includes a background section and a detailed

23  description of the invention.

24         And so you'll see that in this portion of the

25  patent, each page is divided into two columns, and those

1    columns are numbered at the top.  And you will also see

2    there are lines on each page that are numbered, and those

3    numbers go down the middle column.

4          And so, for example, the written description of the

5    '749 patent begins at Column 1, Line 1, and it continues all

6    the way over to Column 7, Line 3 -- 33, I'm sorry.

7          And that's how the patent is organized.  And when

8    you see or hear a reference during the trial to a column and

9    a line number, that's what that is referring to, and you can

10   go to that part of the patent to locate it.

11         Now, toward the end of the patent, there are

12   numbered paragraphs that are called the claims.  And the

13   claims may be divided into a number of parts which are

14   referred to as claim limitations.

15         And so if you would, turn over to Column 6 of the

16   '749 patent, and you'll see right there on Column 6 at Line

17   35, you'll see the words "what is claimed is."  Are you

18   there?  Okay.  And that continues all the way to Line 57,

19   also in Line -- also in Column 6.

20         Those the claims.

21         Now, let me instruct you about the significance of

22   the claims.  They are the -- they are the main focus of a

23   patent case because they define what the patent owner's

24   rights are under the law.

25         The claims define what the patent owner may exclude

1   others from doing during the term of the patent.  And the

2   claims of a patent serve two purposes.

3          First, they set the boundaries of the invention

4   that is covered by the patent.

5          And, second, they provide notice to the public

6   about what those boundaries are.

7          Thus, when a product or a method is accused of

8   infringing a patent, the patent claims are compared to the

9   accused product or method to determine whether there is

10  infringement.

11         The claims of the patent are what is infringed or

12  are infringed when patent infringement occurs because the

13  claims define what the invention is.

14         In reaching your determinations with respect to

15  infringement, you must consider each claim separately.

16         Now, while the claims define the invention,

17  sometimes there is disagreement between the parties as to

18  what certain words or terms in the claims mean.  And when

19  this happens, they ask the Court to interpret those

20  claims -- those terms in light of the patent as a whole.

21         And this is done to help resolve their disagreement

22  and to give you, the jury, guidance in applying the claims

23  to the facts of the case.

24         That happened in this case, and at some time prior

25  to trial, there was a hearing, and the parties presented

1   arguments, and then the Court rendered a claim

2   interpretation of the disputed terms.

3          You will see those claim constructions or terms or

4   interpretations of those terms in your notebook.  However,

5   my interpretation of the language of the claims should not

6   be taken by you as an indication that I have a personal

7   opinion or any opinion at all regarding issues such as

8   infringement.  Those issues are yours and yours alone to

9   decide.

10          But you must use the meanings that the Court

11   provided when you decide the issues of infringement.

12          I'm now going to give you some information about

13   the issues that will be presented to you at this trial, as

14   well as a short overview of the applicable law.

15          At the close of the trial, I will give you written

16   instructions that you must follow in reaching your verdict.

17   You will also be given a verdict form and questions that you

18   will use in answering and in providing your verdict.  And

19   all of that will happen at the very end of the case.

20          As we discussed during voir dire, there are

21   different burdens of proof, and I want to visit with you

22   briefly about the burdens of proof required in this case.

23          In any legal -- legal action, facts must be proved

24   by a required standard of evidence, known as the burden of

25   proof.  As we discussed before lunch, there is the burden

1    that's used in criminal cases called proof beyond a

2    reasonable doubt.  I'm sure you've all heard that.  That's

3    used in criminal cases and does not apply in a civil case

4    like this one.

5         In a patent case like this one, the burdens of

6    proof that will be applied are called preponderance of the

7    evidence and clear and convincing.

8         In this case, the Plaintiffs must prove their

9    claims of patent infringement and damages by a preponderance

10   of the evidence.  When a party has the burden of proof by a

11   preponderance of the evidence, it means that you must be

12   persuaded that what the party seeks to prove is more

13   probably true than not true.

14        Put another way, if you were to put the evidence

15   for and against the party who must prove the facts on

16   opposite sides of the -- of a scale, a preponderance of the

17   evidence requires that the scale tip at least somewhat

18   toward the party who has the burden of proof.

19        The Defendants have the burden of proving

20   invalidity by clear and convincing evidence.  Clear and

21   convincing evidence means evidence that produces in your

22   mind a firm belief or conviction as to the matter at issue.

23        Although proof to an absolute certainty is not

24   required, the clear and convincing evidence standard

25   requires a greater degree of persuasion than is necessary

1   for the preponderance of the evidence standard.

2           If the proof establishes in your mind a firm belief

3   or conviction, then the standard has been met.

4           Again, beyond a reasonable doubt is the highest

5   burden of proof and is used only in criminal cases.  And it

6   does not apply in this case, and you should put it out of

7   your mind.

8           Now, in many trials, only the lawyers for the

9   parties get to ask questions of the witnesses.  In -- in my

10  court, I frequently do something differently.  I permit

11  jurors to ask questions of the witnesses.  And I do this

12  because in the times in the past when I have allowed it, I

13  asked the jurors at the end of the trial whether they

14  thought it was helpful, and they have universally told me

15  that it is.

16          So we're going to do it in this case, and I want to

17  explain to you how it works.

18          After the attorneys are through questioning each

19  witness, each of you will have the option of submitting a

20  written question for that witness.

21          So in your notebook, you will find some blank

22  question forms.  If during a particular witness's testimony

23  you believe that there is something important that you would

24  like to ask that witness, you may write your question on the

25  form after putting the name of the witness at the top.  You

1    don't put your name on the form.

2          So what happens is after the witness has finished

3    testifying and the parties have had an opportunity to ask

4    the questions they want, I will then ask you to pass down

5    any questions you have to our Courtroom Security Officer.

6          And if you don't have a question, I'll still ask

7    you to pass down a blank piece of paper.  And that way we

8    can somewhat reveal who -- conceal who is -- who is asking

9    the questions.

10          I will visit with the attorneys at the sidebar, and

11    then I will decide whether the question or questions is

12    appropriate.  It is very important for you to understand

13    that there may be times you submit a question when I don't

14    ultimately ask the witness the question.  There could be any

15    number of reasons for that, and I want to tell you a couple

16    of what they may be.

17          One is if the question calls for testimony that

18    might be better presented by another witness later on, I

19    might not ask the question.

20          If the question involves a legal conclusion or a

21    question of law, I may not ask the question.  If the

22    question is -- calls for information that the witness would

23    not likely know, I may not ask the question.

24          So there could be any number of reasons that I

25    won't ask a question.  And although I do think this is

1  very -- a very useful procedure, I don't want you to be

2  offended or get your feelings hurt if I don't ask your

3  question.  The truth is the vast majority of questions end

4  up getting asked, and I do think it is helpful.

5       So I'll visit with the attorneys at the sidebar,

6  and if there's -- there are questions that are appropriate,

7  I will ask the witness those questions.  And then I'll give

8  each of the attorneys an opportunity to ask any follow-up

9  questions that they have.

10       It is my hope in allowing you to ask questions,

11  you'll be more engaged in the proceedings and get the

12  information that you need to reach a just verdict.

13       The other thing I would say about it is I don't

14  want it to become too time consuming.  It's usually not.

15  You should not feel compelled to write out a question if you

16  don't think it's necessary.

17       But at the same time, you shouldn't be afraid to or

18  be hesitant to ask a question if you think it would be --

19  help you better understand a witness's testimony.

20       Finally, let me visit with you about your duties as

21  jurors.  You really have two duties as jurors.

22       Your first is to decide the facts from the evidence

23  in the case, and that is your job and your job alone.

24       The second duty is to apply the law that I give you

25  to the facts, and you must follow those instructions, even

1    if you disagree with them.

2          Each of the instructions that I will give you is

3    important, and you must follow all of them.  You should

4    perform your duties fairly and impartially, and you should

5    not allow sympathy, prejudice, fear, or public opinion to

6    influence you.

7          Nothing I have said this morning and nothing I say

8    or do during the trial is meant to indicate any opinion on

9    my part about what the facts are or about what your verdict

10   should be.

11         Again, you, the jury, will be the sole judges of

12   the facts in this case.

13         And that concludes my opening instructions for you.

14         And at this time, the Plaintiffs may present their

15   opening statements.

16         MR. DUNLAP:  Thank you, Your Honor.

17         Your Honor, may I proceed?

18         THE COURT:  You may.

19         MR. DUNLAP:  May it please the Court.

20         Ladies and gentlemen of the jury, I'm going to

21   thank you again.  You keep getting thanked, but I sincerely

22   appreciate your service today.  Thank you for giving up time

23   away from your jobs and your families.  All the lawyers here

24   are doing the same things, but we're doing it under

25   different circumstances, so thank you.

```
1              So I'm going to get down to the nitty-gritty of the

2   case and be very straightforward.  This case is really

3   simple.  It might sound complex.  Telebrands's counsel is

4   going to make it sound very complex, but it's not.

5              This is a case about an invention, a really amazing

6   invention.  And I think some of you have actually used this

7   invention, played with this invention, or you have kids who

8   have used this invention.

9              The first time you see it in action, if you

10  haven't, my reaction was, wow, that's -- that's really cool.

11  That totally makes sense, and why wasn't this around when I

12  was a kid, because I tied water balloons all the time.  And

13  this is exactly the point.

14             This is the story of Josh Malone.  He's a Plano,

15  Texas man who made good on his lifelong dream by solving a

16  problem that no one had ever effectively solved in a new and

17  useful way.  He achieved the quintessential American Dream.

18             Sometimes you'll hear that there are two sides to a

19  story.  But there's only one side to this story.  And that's

20  the side we're going to share with you today.

21             It's the story of the Plaintiff based --

22  Plaintiffs' Texas-based Tinnus and its manufacturing partner

23  ZURU and how they came to be here today in this lawsuit to

24  protect Mr. Malone's invention and how the Defendants New

25  Jersey-based Telebrands and a number of big name retail
```

1    stores, most of which you all know, are trying to bully Mr.

2    Malone out of his American Dream.

3         You were kind enough to share a little bit about

4    you during voir dire.  Mr. Love shared a little bit about

5    himself, and Mr. Findlay shared a little bit about himself.

6         So I'm going to introduce you to the parties, my

7    clients, Ms. Josh Malone and Mrs. Anna Mowbray.  And I'm

8    going to introduce you to myself.

9         My name is Tom Dunlap, and I'm an attorney for the

10   Plaintiffs ZURU and Tinnus.

11        I'm here along with my partner Brian Koide.  And,

12   of course, Mr. Findlay who you've already met.  And the

13   three of us are going to be presenting the case to you from

14   the Plaintiffs' perspective.

15        For my part, I actually started here in Texas in

16   elementary school in Houston at Ponderosa Elementary.  I

17   ended up moving to Virginia.  I attended school there.

18        And then after school, eventually -- actually,

19   before I was a lawyer, joined the Army, was enlisted, and

20   then became an officer in the Calvary, and actually came

21   back to Texas for a very little while.  I was at Fort Hood

22   with the 158th Calvary.  And then I became this, right, a

23   lawyer.

24        So first -- also with me today is Ms. Anna Mowbray.

25   Ms. Mowbray, you'll guess from her accent when she talks, is

1    not from here.  She is from New Zealand.  She's married to a

2    former U.S. Air Force officer.  She has three young

3    children, youngest of which is nine months old.

4          Ms. Mowbray, along with her brothers Mat and Nick

5    Mowbray, are the owners of the ZURU companies.  Mat's the

6    CEO, Anna is the chief operations officer, and Nick Mowbray

7    is the head of sales.

8          They started their toy-making careers in their

9    garage in New Zealand when Mat was 11 and Anna was seven or

10   eight years old.

11         After high school, Mat struck out on his own to

12   chase his dream of making toys, and 15 years later the three

13   siblings now run ZURU and sell Bunch O Balloons with

14   Mr. Malone.

15         And last of the people here today, and certainly

16   not least, is Mr. Josh Malone.  Mr. Malone is here with his

17   wife Alison and their children.  And Mr. Malone is a

18   husband, a father, and an inventor.  He was born and raised

19   north of Dallas.  And after college, he went to work in

20   Dallas for Texas Instruments.

21         In 2006, he left the corporate world and took a big

22   chance.  He took a chance of becoming an inventor.  He

23   actually decided as a career move that he was going to give

24   up a steady paycheck and try to solve problems.

25         So in 2006, he did just that.  He created a company

1    called Tinnus in Plano.  And for the first eight years of

2    his inventor career, he tried inventing things.  He invented

3    a machine to cut paper cards, which he'll tell you about.

4    He invented a water pump device of some kind.  So he started

5    inventing in 2006 full time.  And while it sounds really

6    cool, it didn't replace his paycheck.

7            And then in January 2014, after about eight years

8    of trying to be an inventor, eight years and eight children,

9    he was in his backyard, and he had a eureka moment, he had

10   that ah-ha moment.  He had the idea for something we're

11   going to talk about today called Bunch O Balloons.

12           He not only solved the problem, but he developed a

13   toy that would go on to become the number one selling toy in

14   the United States.  He and his family came up with the name

15   Bunch O Balloons because -- it's dramatic pause -- because

16   it's a bunch of balloons.  It's not that dramatic.

17           And that's -- so it fills a hundred water balloons

18   in one minute.  And if you have eight kids in a backyard and

19   you have to tie a hundred water balloons, it's pretty good

20   math.  So he solved this kind of age-old problem of tying

21   water balloons.

22           I'm going to ask you to do a favor for me now, I

23   understand you guys have notebooks in front of you.  If you

24   wouldn't mind, could you please -- just so we keep the

25   parties straight, could you right down Plaintiff, or you

1   could write P if you want, which is shorthand for Plaintiff

2   and you can use that maybe throughout the case.

3          And then you can put an equal sign.  And the

4   Plaintiffs are Josh Malone and Tinnus.  And then Anna

5   Mowbray, who is going to testify for ZURU.

6          And so that's just, again, so we can keep the

7   products and the names straight throughout the case.

8          Bunch O Balloons, this product is our product.

9   It's the one that Mr. Malone invented, and it's the one

10  that's being sold by ZURU now.

11         So go back to our story.

12         So the year's 2014, and Mr. Malone told his wife

13  Alison that this product was his big break.  And after eight

14  years, his wife and he had some big decisions to make

15  because this was kind of his last shot.

16         If this didn't work out, they both agreed he would

17  quit his inventor career, such as it was, and go back to the

18  corporate world.  Not very excited about that, but they

19  decided to give it a go.

20         They started by filing a patent to make sure the

21  invention was protected.  And, in fact, Mr. Malone has two

22  patents that are at issue in this case which you've already

23  heard about, the '282 and '749 patents.

24         In fact, let me show you what the ribbon copies

25  look like.

1           So this is what a U.S. patent looks like when it

2   issues, and these are actually the actual issued patents.

3   We brought them with us.  And I'm going to try not to lose

4   them.

5           The patents are important because they legally

6   protect Bunch O Balloons.

7           Now, let me show you the invention, so you can have

8   some of the wow factor.

9           I think we have an animation that I'll play for you

10  briefly.  And this is an animation of this product working.

11          If you'd just look to your screens, you can see how

12  Bunch O Balloons works, and tell me if you get the wow.

13          (Videoclip played.)

14          MR. DUNLAP:  And 35 balloons, and there it is.

15          That's -- that's pretty cool.  We have to kind of

16  all admit that.

17          Okay.  So now you understand why the invention is

18  useful.

19          Mr. Malone is going to walk you through his

20  inventive process and how he came up with the idea, what led

21  him to that ah-ha moment and what he did piece-by-piece to

22  develop this.

23          So after they got their first patent on file with

24  the United States Patent and Trademark Office, Mr. Malone

25  did some research on the Internet, and he came across a

1  company called Command Partners.

2         Now, this company, Command Partners, helps people

3  raise money so they can take their inventions and pay for

4  them.  And I think some of the jurors that we interviewed

5  earlier mentioned, well, it's really expensive to get a

6  patent.  And it's really expensive to try to make the stuff

7  that you invent after you get a patent.

8         So Mr. Malone did not have that money, and he

9  needed to raise it.  And Command Partners charged a fee, and

10  at the time it was a pretty big fee for the Malone family,

11  $2500.  And then they got a piece -- a contingency part of

12  whatever he raised.

13         And so Mr. Malone decided to talk to Command about

14  this.  And he got together with them, and they recommended

15  something called Kickstarter.com.

16         I don't know if any of you have ever heard of --

17  have you guys heard of Kickstarter.com?  It's a website

18  where you can go as an inventor and post a project, and the

19  public votes.

20         And the public votes by placing pre-orders for your

21  product.  So if they like your product, they'll pre-buy it.

22         And then once they give you the money, you can make

23  it and send it to them.  And sometimes it works, and

24  sometimes it doesn't work.

25         Well, it's kind of like Shark Tank, that the public

1  is the judge of the invention, like the public decides are

2  we going to fund this, do we think this is great.

3          So he decided to give it a go, and his wife,

4  Alison, approved and they spent another $500 to make a

5  video.  And we'll show you that video later with Mr. Malone.

6          So this is a clip -- a screenshot of the

7  Kickstarter website.  The video I'm going to show you is

8  posted, and that's -- if you hit the play button, that's

9  what happens.

10          So under the terms of this Kickstarter website, Mr.

11  Malone had 30 days to raise the $10,000, which if you look

12  at the very bottom, you'll see pledged 10,000-dollar goal.

13  That's what he set, and that's what he expected to raise.

14  And this was going to be done by paying 15 to $17 for each

15  package of the Bunch O Balloons product.

16          Now, what happened, of course, as you can see in

17  the -- the call out there, is Mr. Malone actually raised

18  $929,000.  And that was kind of a surprise.  And I think I'm

19  perhaps understating it.  The marketing company Command

20  Partners had helped Mr. Malone go viral.

21          As a result, the Tinnus Bunch O Balloons

22  Kickstarter campaign got more views than cute puppies

23  videos, I think, that day; and his family actually -- Mr.

24  Malone will tell this story -- they'd sit at the kitchen

25  table and hit refresh on their Internet browser and watched

1   as people voted and voted and purchased Bunch O Balloons

2   products.

3           Of course, there was some panic because he didn't

4   expect to have to make this many Bunch O Balloons, but it

5   was fantastic.  It was actually the realization of

6   everything he had ever wanted to do as an inventor.

7   Everything any inventor ever wanted to do was this, backyard

8   inventor dream come true.

9           Not surprisingly, the next thing Mr. Malone knew,

10  major media starts reaching out to him.  Bunch O Balloons

11  and Mr. Malone splashed across the page of Time Magazine,

12  Sports Illustrated, People Magazine.

13          They soaked the airwaves on Fox News, ABC News, and

14  Good Morning America, which led to the Today Show, having to

15  one-up Good Morning America, inviting him to appear live

16  with Carson Daly in Times Square.  And we'll show you that

17  video later, as well.

18          For a little while, at least, Mr. Malone was the

19  most famous toy man in Texas.  So toy companies at this

20  point, having seen all this media, began to bombard him with

21  requests for meetings.  Hasbro and other household toy

22  companies contacted him over and over again, and he was,

23  frankly, overwhelmed.

24          At the same time, this was the realization of all

25  his dreams.  Well, so it came to pass, by coincidence, that

1    a New Zealand company, a guy named Nick Mowbray continued to

2    call Mr. Malone over and over again, no response, emailed

3    Mr. Malone, over and over again, no response.

4         And one time he happened to get through.  And he

5    explained to Mr. Malone that he was one of three siblings

6    who owned a family-run toy company called ZURU; and that he

7    had loved the product, thought it would be a smashing

8    success, and he had a way to make the product with

9    custom-made machines.  And he could do it overseas, and it

10   would be inexpensive, and it would be just a knock-out

11   product.

12        So Mr. Malone looked into the toy company and

13   discovered that, like his company, it was something that had

14   been put together by a family.  The toy -- the ZURU toy

15   company, as well, was the story of a rags-to-riches campaign

16   of two brothers and a sister striking out and making it.

17        Mr. Malone read about their humble beginnings, and

18   he thought they were a perfect fit for his ethos and his

19   product.

20        They met -- Nick, Anna, Mat, and Josh Malone met,

21   shook hands; and the rest is history.  They signed some

22   license agreements, and today we're here in court.

23        As you might imagine, the reason we're here is the

24   darker side to our story.  Lurking in the shadows of the

25   Internet, trolling websites of other companies for ideas,

 1    was Telebrands.

 2            So I'm going to ask you to do me a favor again so

 3    we can keep the parties straight.  If you would write D for

 4    Defendant in your notebook, and if you would write

 5    Telebrands, Bulbhead, AJ Khubani, Bala Iyer, and those are

 6    the principal witnesses.  There are also the retailers in

 7    this case.  And you don't have to write all of them down;

 8    but if it's a story you've heard of, they're with the D.

 9            So back to our story a little bit.  And thank you

10    for doing that.

11            How do we know Telebrands was watching from the

12    shadows?  Well, we know because the evidence will show in

13    emails that are already admitted in this case and that we'll

14    share with you in this case, that they were monitoring

15    websites, particularly Kickstarter.

16            One email in particular, which is Plaintiff's Trial

17    Exhibit 83, is an email from Telebrands' own Sherrie Stulec.

18    She sent this on July 22nd, 2014, during Mr. Malone's

19    Kickstarter campaign.

20            And you can see here this "check this out," and

21    that is a link, you will see, to a news article.  The simple

22    contraption let's you make a hundred water balloons every

23    minute.  Well, guess, in July of 2014, what that was?  That

24    was Josh Malone's invention.

25            The next email we'll show you is from a Mr. Hynd,

1   and that email is Plaintiff's Trial Exhibit No. 84, sent on

2   August 1st, 2014, still during the Kickstarter campaign,

3   independently sent.

4        The third email -- well, you can read this email.

5   And we'll put it into evidence, but it says:  In the

6   interim, please find a link to one of the best kids'

7   products I've ever seen.

8        The third email we'll show you -- another exhibit

9   already admitted in this case, PTX-137, is an email from

10  Mr. Rogai.  You'll see at Pages 1 and 2, also already

11  admitted in this case, that Telebrands purposefully and

12  willfully worked in secret with their contractor, Mr. Rogai,

13  to develop a copy of Bunch O Balloons.

14       So unlike ZURU, Telebrands didn't call Mr. Malone.

15  They didn't ask to team up.  They didn't ask to make his

16  products for him or with him.  They just took it.  They saw

17  it, and they took it.

18       In early 2015, long after the Kickstarter campaign,

19  Telebrands began marketing and selling what I would say is a

20  very similar product to Mr. Malone's called Balloon Bonanza.

21  And this is that product.

22       This is where the rags-to-riches story of Mr.

23  Malone's dream starts to come apart.

24       Telebrands is a company that, as far as we know,

25  had generally not been in the toy business before.  And they

1  decided to take what was not theirs.  So we're talking about

2  toys here.

3       So imagine you're a child and you've got a red

4  shiny truck, and you're in your sandbox or in the play

5  ground, you're playing with your shiny truck and rolling it

6  back and forth and a bully comes up and he kicks you and he

7  takes that truck.

8       Bully didn't need the truck.  Bully had his own

9  toys, but he wanted your truck, and he did it, and he didn't

10 give it back.  And that's what happened here.  The bully

11 came along, he kicked you, and he took Mr. Malone's shiny

12 red truck.

13      In my left hand, right here is the original.  And

14 in my right hand is the Balloon Bonanza copy from

15 Telebrands.

16      Now, at some point, you're going to get to handle

17 these and look at these.  And I ask that you take a careful

18 look at these two products.  They look the same, but what's

19 more important is they work the same.  You screw them on to

20 the end of a hose, you turn the hose on, it fills the

21 balloons up with water, and they close themselves.  And

22 you've got a bucket full of water balloons to fight with.

23      Now, Mr. Malone has filed suit here against

24 Telebrands to stop them from copying his invention.  But

25 Telebrands didn't stop copying with Balloon Bonanza.

1          A year later, in 2015, in December, I believe,

2     Telebrands began advertising and then subsequently selling

3     another copy of Mr. Malone's products called Bunch O --

4     Battle Balloons.  Sorry, getting the names confused.  That's

5     why we write them down.

6          And this is a copy of Battle Balloons.  This is one

7     of those products.  Telebrands essentially had come back,

8     after stopping its campaign here, and made another copy.

9          The evidence will show that these products all work

10    in the same way.  You screw all three of these products on

11    to the end of a hose, and the straws fill the balloons and

12    the balloons come off and fill up with water.

13         The evidence will show that Telebrands did not give

14    up its quest to willfully force Mr. Malone out of the

15    market; and that Mr. Malone and ZURU were forced to bring

16    this second lawsuit to enforce his patents.

17         During the course of the week, you're going to

18    hear from some smart and interesting people.  You'll hear

19    from Josh Malone himself because he's here to protect and

20    defend his patent.  It's a quintessential American

21    success story of ingenuity and hard work.

22         And you'll hear from him about the earth-shaking

23    frustration, despair, and righteous anger he had at seeing

24    Telebrands take his invention for their own.

25         Next you'll hear from Ms. Anna Mowbray of ZURU

1    toys.  Ms. Mowbray will explain why ZURU loved Bunch O

2    Balloons and how she knew Bunch O Balloons right out of the

3    gate would be a smashing success.

4          She'll tell you about her frustration, her outrage

5    at Telebrands' theft of Bunch O Balloons and how she fought

6    tooth and nail for the last couple of years to undo the

7    irreversible harm to the reputation of Bunch O Balloons.

8          She'll tell you how Telebrands saw the Bunch O

9    Balloons Kickstarter commercial and, frankly, copied it and

10   made a very similar commercial before Mr. Malone and ZURU

11   could get their products on to the market.

12         You'll also hear from Dr. Barry Kudrowitz.

13   Dr. Kudrowitz is a professor, but he's probably got the

14   coolest professor job that I've heard of it.  I never went

15   to this class.  He's a professor of toy.  His office is full

16   of toys, he rides bikes around the hallways.  He's a

17   professor of toy design at the University of Minnesota.  And

18   he's an expert in patents, and he's going to walk you

19   through how this works and how this product, Battle

20   Balloons, infringes Mr. Malone's '282 and '749 patent.

21         You'll also hear from Mr. Alan Ratliff.  Mr.

22   Ratliff is a Baylor law grad and a nationally-known

23   economics expert based in Houston, Texas.  He'll walk you

24   through the facts on the law and on how patent damages work

25   and how Telebrands made money at the expense of Mr. Malone

1   and ZURU to the tune of more than $20 million.

2            You'll also hear from Telebrands.  In fact, we're

3   going to ask Telebrands to testify in our case, we're going

4   to ask their principals.  They're the self-proclaimed leader

5   in television marketing since 1983.

6            I think some of you or some of the jurors today had

7   already purchased some of their products.  They started the

8   As Seen On TV brand; and they are still, I believe, the

9   biggest television marketing company in the world.

10           They have a lot of products, and I know some today

11   mentioned were the PedEgg, I think also Ambervision

12   sunglasses and the Pocket Hose are some of the inventions

13   that you may have purchased or seen by Telebrands.

14           They have a business model, and their business

15   model, which they call innovation, but which involves

16   copying someone else's stuff and passing it off as their own

17   to make millions of dollars.

18           So every time Telebrands says the word "innovative

19   business model" or "innovation," what they mean is we're

20   going to bully other people off the market.  That's their

21   business model.

22           We'll invite Mr. AJ Khubani, Telebrands' CEO and

23   founder, and Mr. Bala Iyer, Telebrands' chief operating

24   officer, to talk about Telebrands' business model.  And we

25   can talk with them about the victims they've bullied.

1          We'll play some short video clips to support this

2    evidence.  In fact, you'll hear from Telebrands' own

3    Giuseppe Landolfo, one of their employees.

4          The evidence will show that Telebrands came across

5    Mr. Malone's Kickstarter campaign, saw his demonstration on

6    the Internet, and decided immediately to willfully take

7    Bunch O Balloons for themselves.

8          Telebrands is a huge company by itself, but let's

9    not forget they're not alone today.  Stacked against Mr.

10   Malone and ZURU today are also the retailers.  They include

11   people -- companies that you've heard of like Bed Bath &

12   Beyond, Sears, Walgreens, Kroger, and Fry's.

13         The evidence will show that these retailers, too,

14   despite knowing about Mr. Malone's invention, despite

15   knowing about Mr. Malone's patents, they each individually

16   knowingly decided to conspire with Telebrands and sell this

17   copycat infringing balloon product Battle Balloons.

18         It will show the evidence -- the evidence will show

19   that the retailers not only didn't care about Mr. Malone,

20   but they're too big to care, they're too big to fail.  It

21   didn't matter to them.

22         I would like to ask you to care on behalf of

23   Mr. Malone, his family, who helped him put this invention

24   together, and ZURU.

25         Telebrands is going to tell you today, and I

1    believe Mr. Findlay covered this before, but I'm doing it

2    again just to be clear.

3          First, we didn't take the idea.  We didn't copy the

4    idea.

5          Second, if we did take the idea and we did copy the

6    idea, we didn't infringe Mr. Malone's patents.

7          Third, okay, if we took and copied and infringed,

8    it doesn't matter because Mr. Malone's patents aren't valid,

9    they're obvious.

10          Okay.  If we took, copied, and we infringed and the

11    patents aren't obvious, then don't award him damages because

12    he's not really harmed or the damages aren't there.

13          I'd ask you to think back now on the video you saw

14    of the judge who explained how patent law works.  And to

15    what Mr. Findlay said, Mr. Findlay had a great analogy.

16          ZURU and Bunch O Balloons and Mr. Malone and

17    Tinnus, all they have to do is carry the football to the 51

18    yard line.  If you believe they tip the scales that little

19    bit to prove their case, that this product infringes Bunch O

20    Balloons, then they've made their case.

21          Telebrands, on the other hand, has to get the

22    football to the red zone.  And the red zone -- I assume

23    everybody here watches football, but I may be wrong, but the

24    red zone is a heavier scale, a much bigger burden, they have

25    a lot more to lift to meet the burden to prove that Mr.

1    Malone's patent is invalid.

2            During the course of the trial, you're going to

3    hear other product names I mentioned.  You're going to hear

4    Balloon Bonanza, you're going to hear Battle Balloons, these

5    two products.

6            And I want to remind you these are the names,

7    again, with the D next to them, they're Telebrands' copycat

8    products.  These are the names that -- the products that

9    Telebrands illegally copied from Mr. Malone's original Bunch

10   O Balloons invention.

11           And while they sound like Bunch O Balloons, in

12   fact, kind of funny because during the case the lawyers

13   mixed up the names a lot, too, as you can imagine, but

14   they're not, they're different products.

15           I'm going to wrap up now, probably mercifully, and

16   tell you the that the Malone family and the Mowbray family

17   are here asking you on behalf of their companies for a few

18   things.

19           First, they're going to ask that you find the

20   patents are infringed; that you award damages for that

21   infringement; and that you find that Telebrands did this

22   willfully; that they did this intentionally.

23           I'm going to ask you to watch the right balloon.

24   Remember, there's no set of facts here today that either

25   we'll present or Telebrands will present that says that

 1  Telebrands invented anything or had any new ideas, no set of

 2  facts.

 3          Telebrands' business model is why we're here, and

 4  it's a model that needs to be reformed, and this is your

 5  chance to reform it.

 6          At the close of all the evidence, we're confident

 7  that you will hold these bullies accountable for

 8  infringement and for willful infringement of these patents.

 9          We look forward to presenting the evidence to you.

10  And I, again, thank you for your service.

11          MR. UNDERHILL:  Your Honor, may I have a

12  five-minute warning?

13          THE COURT:  You certainly may.

14          MR. UNDERHILL:  Thank you very much.

15          Tom, may I use your samples there, please?

16          MR. DUNLAP:  Sure.

17          MR. UNDERHILL:  Thank you.

18          MR. DUNLAP:  There's -- the question, Your Honor,

19  of that slide that we didn't resolve in Mr. Underhill's

20  opening, I believe is resolved, okay.

21          MR. UNDERHILL:  Good afternoon.  I'm Mike

22  Underhill.  And it may not be real important to some people,

23  but it is to me.  He said I live in Maryland, I don't.  I

24  live in Virginia, and I'm very proud of Virginia.  I was

25  born in Arkansas, but I've been in Virginia for a long time.

1          The -- if what Mr. Dunlap said was accurate, we

2    would not be here.  You remember when there was a question

3    and people were raising their hands, yeah, we don't think

4    people should steal, and all that kind of stuff?  Well, if

5    we were allowed to raise our hands, we'd be raising our

6    hands too because we feel exactly the same way.

7          The evidence will show here that Telebrands

8    competed fairly with the Plaintiffs, ZURU Ltd and Tinnus

9    Enterprises.  And that, you know, includes Mr. Malone.

10          Now, you may be sitting here scratching your heads

11    after hearing that, how in the world could you say that

12    that's fair competition?  And I'm going to tell you about

13    it, okay?

14          Every -- let me start by saying, everyone agrees

15    that Mr. Malone designed a really attractive, cool looking

16    product, for filling a hundred balloons in less than a

17    minute.  It had the wow factor, okay.  We're not going to

18    dispute that.  It was a cool idea.

19          Now, he's entitled to recognition for making a cool

20    idea, and -- and he's profited from it.  We all benefit,

21    you, me, everybody, from new products.  And we, Telebrands,

22    I mean, we agree, creative people need to be recognized.

23          But that doesn't mean that every new product is

24    entitled to keep fair competition out of the market.  Fair

25    competition really is part of what made America great.

1          American companies constantly compete to make

2     better products in the fight for consumer dollars.  And the

3     consumer wins because there's more choices.  There are

4     rules, and Telebrands followed the rules.

5          Companies must compete fairly.  The evidence will

6     show that Telebrands is very careful not to infringe on

7     patent rights.  Telebrands has to be careful.  It's a

8     privately-held company.  It's got no insurance for these

9     kinds of lawsuits.

10          And the evidence will show that Telebrands did not

11     violate Mr. Malone's patent rights.

12          The evidence will also show that this case is

13     really a battle between two companies that are fighting for

14     market share.  There's Telebrands, an American company in

15     New Jersey, and ZURU Ltd, which we were told started in New

16     Zealand and is now headquartered in China.  It's a

17     conglomerate, actually.  They're being a little modest about

18     who ZURU is.  It's a collection of companies.

19          They're also a little bit modest about the lawyers

20     that are representing them.  There are a long list of

21     lawyers that were not introduced today at the various law

22     firms at Findlay Craft.

23          There was Brian Craft who's entered an appearance

24     in this case to represent the Plaintiffs.  And the other

25     firm, Mr. Dunlap's firm, David Ludwig, Robert Spendlove,

1    Jeff Ahdoot, KC Chambers, Ellis Bennett, they've all entered

2    appearances to represent the Plaintiffs in this case.

3          So, you know, this idea of we're tiny and

4    undermanned just -- it just doesn't fly.

5          Now, free competition -- let me also say some

6    companies hate competition.  Some companies don't want to

7    compete.  And what ZURU is doing here is using the U.S.

8    ports to unfairly try to stop Telebrands from competing.

9          Free competition, though, is part of what makes

10   America great.  And if you think about it, Apple comes out

11   with a cell phone, and Samsung comes out with one that looks

12   pretty doggone similar, Apple comes out with a better one,

13   and it just keeps going.  So this happens all the time,

14   including in the toy industry.  Telebrands competes.  ZURU

15   competes.  Most companies compete.

16         Now, let's talk about the product that's at issue

17   here.  But first, I'm going to tell you about Balloon

18   Bonanza.  It's this product here that counsel used.

19         How many people here think this is the product

20   that's being accused of infringement in this case?  Okay.

21   It's not.  This product is not at issue in this case.

22         In 2014, Telebrands was approached about developing

23   a similar product to Bunch O Balloons.  They called it

24   Balloon Bonanza.  And let's compare the two.  This is the

25   ZURU product.  This is --

```
 1              Your Honor, may I approach the jury?
 2              THE COURT:  You may, but I'd like you to take a mic
 3  with you if you're going to get away from the podium.
 4              MR. UNDERHILL:  Okay.  Do I have a mic?
 5              THE COURT:  No, I'll -- we'll give you one.
 6              MR. UNDERHILL:  Thank you.
 7              THE COURT:  And then when you get back to the
 8  podium, you'll need to take it off.
 9              MR. UNDERHILL:  Yes, sir.  Around my neck?
10              COURTROOM DEPUTY:  Yeah.
11              MR. UNDERHILL:  Okay.
12              COURTROOM DEPUTY:  And it may not be on.
13              MR. UNDERHILL:  I am pretty loud.  I'm not sure I
14  need this.
15              Sorry about this.
16              Okay.  Here's the ZURU product.  This is the Bunch
17  O Balloons, Mr. Malone's product.  Here's the first
18  Telebrands' product.  You think they're very different?  I
19  don't.  Okay.  They're really, really close.  Okay.  Couple
20  of minor differences, by the way.  You can push these
21  through here, but you can't on this one.  But it's minor
22  stuff.
23              So why am I telling you this?  Because it's
24  competition.
25              When this product here was introduced, there was no
```

 1   patent.  I don't believe they mentioned that to you, that

 2   there was no patent when we launched this product.

 3          If there's no patent, we're allowed to compete.

 4   That is the way America works.

 5          Now, let me talk a little bit about Telebrands, and

 6   I'm going to come back to the products.  Telebrands is one

 7   of the best TV marketing companies in the United States.

 8   It's been producing award winning commercials for over 30

 9   years.

10          Now, one of the producers of Telebrands'

11   commercials, which, you know, win awards all the time, is

12   Anthony Sullivan.

13          Now, you may know him from the OxiClean

14   commercials, if you see him on the television.  He's right

15   here.  He's joined us today.  Mr. Sullivan, would you stand

16   up so we can see who you are.

17          Now, early products of Telebrands included

18   Ambervision sunglasses.  That's an old product.  It was one

19   of the first television successes.  Lots of recent products

20   that you've seen on television, at least many of you

21   probably have.

22          There's the Star Shower which one of the gentlemen

23   mentioned earlier today.  You know, you decorate the outside

24   of your house.  There's Red Copper cookware with Cathy --

25   Cathy Mitchell who's the red-headed lady with the real

1    high-pitched voice.

2           Telebrands spends a lot of time and a lot of money

3    on its advertising, including for its Balloon Bonanza

4    product.  That's the first one.  That's the one that's not

5    accused of infringement in this case.

6           And the evidence will show that after seeing

7    Telebrands' commercial on Balloon Bonanza, ZURU copied it.

8           Now, I don't believe counsel mentioned that, that

9    they copied our commercial.  We're going to talk to

10   Ms. Mowbray about it when she's on the stand because she's

11   the one sending the emails saying no, no, you got to copy it

12   tighter, it's got to be closer to Telebrands' commercial.

13          Now, before I explain more, let me introduce you to

14   my client.  Telebrands was founded by Mr. AJ Khubani in

15   1983, when he was 23 years old.  He was born and raised in

16   New Jersey.  And his parents taught him the value of hard

17   work at a very early age.  He worked his way through a state

18   college in New Jersey.  He graduated, but he couldn't find a

19   job.

20          So what'd he do?  He took his life savings.  And,

21   of course, he was only 23, so it wasn't that much.  He

22   started selling radios through a mail order ad in the

23   National Enquirer.

24          After 34 years of hard work, he went from cleaning

25   toilets, to CEO of American success story.  Telebrands

1   provides salaries, health benefits, and pension benefits to

2   its 90 employees, all of whom work at its only office in New

3   Jersey.

4          Along the way, he invented the As Seen On TV logo

5   that you have in front of you there.  He made it available

6   for free to anybody that wanted to use it.  And now you see

7   it all over the place.  You know, everybody uses it, not

8   just Telebrands.

9          Telebrands does sell many products that many of you

10  have seen on TV.  I've talked about a couple.  A few more

11  and maybe the one you see the most is the My Pillow

12  commercials, the Atomic Beam Lantern, the Hurricane Spin

13  Scrubber, and PedEgg, which, again, I think a couple of

14  folks on the jury have actually used.

15         Let me introduce the three folks that are here from

16  Telebrands, Mr. AJ Khubani, the CEO; Mr. Bala Iyer, the No.

17  2 guy, the COO; and Ms. Arline Wall who is the vice

18  president of product development.

19         Now -- thank you very much.

20         Now, let's talk about the patents at issue in this

21  case.  The focus of this case is the language that Tinnus

22  chose to include in the patents.  It's not enough to say,

23  hey, I've got a product, you screw it on a hose, you fill it

24  up, they all fall off, so you can't do it.

25         You've got to actually put your idea down in a

1    patent, and you've got to claim in the numbered claim

2    exactly what your invention is.  It's the language in the

3    claim that provides the boundaries that tell customers

4    what's fair game and what's not.

5         Now, my original draft said it's very revealing we

6    didn't hear much about the language in the patents.  But I

7    can't even say that.

8         We didn't hear a word about what was in the patents

9    from opposing counsel because if you focus on the actual

10   claim language and apply it to the evidence, you will

11   conclude that Telebrands competed fairly.  We did not do

12   what that claim says.

13        Telebrands, as I said, introduced the Balloon

14   Bonanza product in December of 2014.  This, again, not at

15   issue in this case.  We did this before there was a patent

16   out there.  And it's just -- it's just -- it's part of their

17   story.  There's going to be evidence from the -- from the

18   lectern, those emails about let's -- let's look at this,

19   this is really cool, all that kind of stuff.  Those were

20   emails that were in conjunction with our Balloon Bonanza,

21   which was before they had a patent.

22        Now, the second product we came out with is Battle

23   Balloons.  It came out one year later, December of 2015.

24        Now, the patents in this case did not issue -- the

25   first one in this case issued on January 26th, 2016.  So the

1    patent came out after this product was on the market.  We

2    did know that this patent was coming.  We had seen the

3    published patent application.  But we weren't in the

4    slightest concerned about it.

5           And I'll tell you why.  We're going to get into the

6    language in a little bit.  We're going to look at the

7    patent, and it does not describe this housing.

8           Now, I'm going to use a model here in a minute.

9    Kind of hard to see the little one.

10          So this is what the housing looks like.  And it's

11   different than the housing on this one.  This one is flat.

12   All the holes, you know, on a single surface.  This one,

13   every one is on a separate surface.  It was done for a

14   reason.  And let me be clear, it was done to avoid the

15   patent.

16          We wanted to compete, we knew the patent was

17   coming, and we did not want to infringe.  So we made

18   changes so we wouldn't infringe.

19          Did counsel tell you any of that?

20          Now, let's look, if we could, please, at the

21   numbered claim that the Court pointed you to.  It's Column

22   6, very last page of the '749 patent.

23          And as the patent video you saw says, the claims

24   are like the fence around a piece of property.  Do you

25   remember that in the video?  You know, it's like a fence,

 1   just like, you know, one you may have where you live.

 2          The words of the claims are critical.  They tell

 3   you where the boundary lines are between what you're allowed

 4   to do and what you're not allowed to do.  It's critical to

 5   know those boundary lines.

 6          Let me give you an example.  We like football, too,

 7   by the way.

 8          Could we have the next football slide?

 9          There we go.

10          Here's a hypothetical patent.  The guy says, I

11   invented a football.  And he describes within the claims as

12   it's filled with air, use a hollow needle for filling, made

13   of leather, oblong shaped.

14          Okay.  That's his -- that's his patent claim.

15   Obviously, this is a hypothetical.

16          A fellow comes out with another football.  And the

17   guy with the patent says, you're infringing my patent,

18   you've got a football.

19          He says, well, yeah, I've got a football, but it's

20   not claimed in your patent.

21          He says, what do you mean it's not claimed in my

22   patent?  It's filled with air, yeah.  It's got a hollow

23   needle for filling, yeah.  It's oblong shaped, yeah.  But

24   the football I came out with is made of rubber, and your

25   claim says it's made of leather.  And so, therefore, my

1    patent -- my football is outside your patent.

2           You can compete.  And you can sue all you want, but

3    there's no infringement of that patent.

4           Now, let's talk about the two specific requirements

5    that are in the '749 patent that are not in our product.

6           The first requirement is that there has to be

7    multiple holes at a second end.

8           Now, we all agree, everybody, it won't be in

9    dispute, this is the first end.  This is the end that, you

10   know, screws into the faucet or the hose.

11          Okay.  And where's the second end?  Well, I'd say

12   the second end is right there.  And the patent says you've

13   got to have multiple holes.  It actually says a plurality of

14   holes, which just means more than one.

15          So I don't know, can we look at that.  Anybody see

16   a hole there?

17          And it's got to have multiple holes.  So you know

18   what Plaintiffs say, they say, well, you know, that's not

19   the second end.  The second end goes all the way from here

20   up to here.  That's all the second end.  So you've got lots

21   of holes.

22          Well, I would submit that doesn't make sense.  And,

23   you know, to use an analogy, and I like to shoot birds, you

24   know, every now and then.  You know, you take a shotgun, you

25   look at, you know, one end, the butt stock, or the butt pad

1    if you don't like the recoil, you know, that's one end.

2         Where's the other end?  The other is the muzzle

3    where the buckshot comes out of.  It's not the barrel and

4    the action and the trigger guard.  That's not the second

5    end.  So that's requirement number one that we don't do.

6         Now, are you surprised they didn't even talk about

7    the patent in their -- in their presentation?

8         The -- the second requirement is that even if the

9    holes are in the second end, so let's accept their -- let's

10   pretend like we're going to accept that -- that argument,

11   this whole thing is the second end.

12        Next requirement is that multiple holes have to be

13   in a common face.  And the Court will instruct you that a

14   common face must be a shared surface.

15        You see the way this is designed, it's like a

16   staircase, you know, it's flat.  You know, you step up.

17   Think about going up steps, you go up steps, is the top of

18   each step, are they a shared surface, or is each one its own

19   surface?  I would submit each one is its own surface.

20        So, you know, at the end of the day, two reasons

21   we're outside the '749 patent.  This is the only product

22   that's accused of infringement in this case.  Let me

23   contrast it with something.

24        You remember Balloon Bonanza?  Let's see, does this

25   have holes in the second end?  Yes, it sure does.  That's

1    first -- that's second.  Is it common face, is that a shared

2    surface?  Yeah, it sure is.  So that's why we redesigned the

3    product so that it would not infringe.  It's this product

4    that's at issue in this lawsuit.

5          Now, let's move on to the second patent.  It's the

6    '282 patent.

7          Now, it does not have the two requirements that I

8    just told you about.  Okay.  So you may ask, what's our

9    argument for how we don't do that?  And the answer is, we

10   don't have one.  Okay.  We are covered by the '282 patent.

11   Not covered by the '749, but we're covered by the '282

12   patent.

13         So you might be thinking, well, we've got -- we've

14   got a problem because we are covered by the second patent.

15   Let me tell you about that second patent.

16         After we launched our product, Mr. Malone changed

17   his claims at the Patent Office and got the Patent Office to

18   issue the '282 patent which took out those two requirements

19   that were in the earlier patent.

20         And so, basically, the way we view it, it's like

21   moving the fence line.  So here's a -- here's an analogy,

22   you've got a little barn and, you know, a -- a fence.  Let's

23   say the pond is Telebrands' product.  It's outside the fence

24   on the '749.  And Mr. Malone got the Patent Office to let

25   him enlarge the fence, so now all of the sudden we're inside

1   the '282.

2          But -- but he got a problem when he did that.  And

3   the evidence will show the '282 patent is invalid.  That

4   means the government should not have issued it.  It's

5   irrelevant whether anyone infringes an invalid patent.  If

6   the patent's no good, it's no good.

7          The evidence will show that the first patent in

8   this case, the '749 that I was talking about before, we

9   think that's invalid, too.  Specifically, all claims of both

10  patents are obvious because of the prior art.

11         You remember that term from the video, prior art

12  sounds kind of odd, we don't really talk that way in normal

13  language, but you know that that's all of the ideas that are

14  older than the patent.  And let's see what some of those

15  ideas were.

16         Here, we have a -- a timeline.  This will be some

17  of the prior art applications that we're talking about.

18         And then here's the timing of Mr. Malone's

19  applications.  So they're -- they're way, you know, ahead of

20  him.  In fact, you know, the earliest one is from 1991.

21         Now, let's go to the next slide, please.

22         The -- there's at least four references that we're

23  going to talk about, prior art, that taught filling multiple

24  balloons.  And, you know, you can see some of the pictures

25  here of some of the ideas for filling multiple balloons.

1           Let me be clear, some of them are -- they're all

2    pretty clunky, not the kind of thing you'd walk into Walmart

3    and buy.  They're clunky.

4           So -- but let's -- but they were there.  They were

5    ideas to fill multiple balloons.

6           Let's go on to the next idea.

7           The idea of automatically sealing balloons was also

8    well-known in the prior art.  And Donaldson, kind of a crazy

9    looking thing, but it's a tube, you put air into it, you're

10   using a rubber band to hold it on a tube just like Mr.

11   Malone is doing, and then it comes off and it seals.

12          So this, you know, trick of putting a band on it

13   and when it slips off the tube it, you know, closes.  No,

14   that was known.

15          And then also Lee was another example.  This was

16   actually something they were -- a medical idea.

17          So other people had already disclosed these ideas.

18          You will -- and these ideas existed before he even

19   filed for a patent.

20          Now, you may recall that prior art must be

21   evaluated from the perspective of one of ordinary skill in

22   the art.  Again, not a term that we normally use.

23          But this imaginary person is an expert on

24   expandable containers like balloons.  So the question, by

25   the way, is not whether you would have thought it was

```
 1   obvious or I would have thought it was obvious.  The
 2   question is whether or not it would have been obvious to one
 3   of ordinary skill in the art to combine these two concepts,
 4   which is what Mr. Malone did.
 5          The -- this imaginary person, by the way, knows
 6   about all the prior art.  So it's not a matter whether they
 7   knew about it or not, he knows everything.
 8          Now, would this imaginary expert have found the
 9   claims of the '749 and the '282 patents to be obvious?  We
10   think the evidence is overwhelming that, yes, it's only
11   common sense.
12          If you already know you can use a rubber band to
13   hold one balloon on a tube, you're certainly going to know
14   that you can use rubber bands to hold many balloons.  It's
15   either that, or, you know, you got to get some more hands or
16   get friends to hold on multiple balloons.
17          It's critical that you focus on the patent claim
18   language and not the ZURU product.
19          Throughout this trial, counsel is going to talk
20   about the Bunch O Balloons product, Mr. Malone's product.
21   He's going to talk about it over and over and over again.
22   He's going to pretend like this is the invention that you
23   should be comparing to our product.  That's wrong.  The
24   Court's going to tell you the comparison is the claim
25   language to our product.
```

1          Now, you may ask yourself how is it that you're

2     qualified to determine invalidity of the patents?  There's

3     no patent police.  We can't pick up the phone, call the

4     patent police, and say, hey, this patent needs to be

5     invalidated.  That, ladies and gentlemen of the jury, is

6     your job.

7          Our system -- our jury system gives you the duty

8     and power to correct patents that should not have issued.

9     Government employees are human, after all; and unlike the

10    government employee that decided to issue the '749 and the

11    '282 patents, you will be able to hear Telebrands' side of

12    the story.

13         THE COURT:  Mr. Underhill, you have five minutes

14    remaining.

15         MR. UNDERHILL:  Thank you.

16         We're going to have an eminent expert from MIT.  At

17    the end of this case, you will have lots of information that

18    the government did not have when it issued the patents.

19         Let's talk quickly about damages.  If you find that

20    the patents are invalid or Telebrands does not infringe,

21    damages are zero.

22         Now, I do want to talk about damages a little bit

23    anyway though because Plaintiffs are dramatically

24    overreaching.  What did he say, $20.5 million?  Crazy.

25    They're trying to get an astronomical windfall out of this

1   case.

2          ZURU's litigation position is that it had $19.7

3   million in revenue from sales to Walmart for sales of

4   Bunch O Balloons in 2016.  This is what they're saying for

5   purposes of this litigation.  They're saying they made

6   profits of $13,800,000.  Complete nonsense.  They made this

7   up for this trial.

8          We will show you the actual audited financial

9   statements that ZURU Ltd. -- ZURU Ltd. is the party in this

10  case.  It's not the ZURU conglomerate.  It's not ZURU, Inc.

11  It's ZURU Ltd. is the party in this case.  And its top

12  executive signed off on audited financial statements that

13  show revenues in 2016 of only $1.6 million and profits of

14  only $142,413.

15         Please, keep an open mind.

16         ZURU Ltd. gets to go first.  They're going to leave

17  out all the important stuff.  Please wait until we put our

18  evidence on before you make a decision.

19         At the end, Telebrands is confident you will find

20  that Telebrands competed fairly.  And I'm now going to cede

21  the rest of my time, sir, to the retailer counsel.

22         MR. LEE:  May it please the Court.

23         Good afternoon, ladies and gentlemen.

24         I just want to speak with you briefly a little bit

25  about the retailers.

1          Now, I represent all of the Defendants in this

2    case; but I want to speak specifically about Sears, Fry's,

3    Kroger, Walgreens, and Bed Bath.

4          As you just heard from my co-counsel, Mr.

5    Underhill, we're essentially here to settle a dispute

6    between two companies, Telebrands and ZURU.

7          These retailers are here today because they sold

8    Telebrands' water balloon product.  But it's important to

9    note that every one of them, except one, also sold ZURU's

10   water balloon product.

11         You know these companies.  I'm confident most of

12   the people in this room have shopped at one of these stores.

13   I know my family does.

14         I get my prescriptions filled at Walgreens.  My

15   wife loves to shop at Bed Bath.  Just like you and I rely on

16   these retailers to provide us with a wide selection and

17   variety of quality goods, these retailers rely on Telebrands

18   for that same selection and quality of product.

19         And Telebrands delivers.  These retailers have a

20   long-standing, solid relationship to Telebrands.  And I can

21   tell you that they are in complete agreement with what --

22   what Mr. Underhill just articulated as Tel -- Telebrands'

23   positions in this case, and that Telebrands has done nothing

24   wrong.  And these retailers have stood by Telebrands

25   throughout this dispute, and they continue to do so today.

```
 1              We look forward to presenting our case to you, and
 2   thank you for your service.
 3              Thank you, Your Honor.
 4              THE COURT:  Thank you, Mr. Lee.
 5              Ladies and gentlemen of the jury we're going to
 6   take an afternoon recess at this time.  We'll be in recess
 7   for about 15 minutes.
 8              Don't discuss the case or anything about it until
 9   all of the evidence has been presented, and I've instructed
10   you on the law.  We'll be in recess.
11              COURT SECURITY OFFICER:  All rise.
12              (Jury out.)
13              THE COURT:  You all may be seated.  Counsel, if you
14   would approach.
15              (Bench conference.)
16              THE COURT:  So when we come back, I -- I'll ask you
17   whether you want to invoke the Rule, and we'll deal with the
18   witnesses in the courtroom.  I'll ask you to move any
19   pre-admitted exhibits -- if y'all are prepared to do that
20   now.
21              MR. FINDLAY:  We have a list of pre-admitted
22   exhibits.
23              THE COURT:  Okay.  Good.  And then I considered the
24   issue with respect to Mr. Khubani and -- is it Iyer?
25              MR. FINDLAY:  Iyer.
```

```
 1              THE COURT:  Iyer?  I will allow one or the other to
 2    be in the courtroom at any time.
 3              MR. UNDERHILL:  Okay.
 4              THE COURT:  They can trade off, however they want
 5    to work it, but I'm not going to allow both of them in at
 6    the same time.
 7              MR. UNDERHILL:  Understood, sir.
 8              MR. FINDLAY:  Your mic is still on.
 9              MR. UNDERHILL:  Oh, thank you very much.  I'll take
10    it off in just a second.
11              THE COURT:  Anything else we need to deal with?
12              MR. UNDERHILL:  Yes, sir.  We had major problems
13    with the argument.
14              THE COURT:  Hold on.  Is your mic --
15              MR. UNDERHILL:  I can take it off.
16              THE COURT:  Well, I just want to make sure it's not
17    on.
18              MR. UNDERHILL:  I'm sorry.  I'm not -- I'm not used
19    to wearing these.
20              THE COURT:  We'll -- we'll -- you'll figure it out
21    after a day or two.
22              MR. UNDERHILL:  I am so loud though.  I wonder if I
23    even need it though.
24              THE COURT:  Well, the problem is -- the problem is
25    the court reporters in the back --
```

```
 1                MR. UNDERHILL:  Sure.

 2                THE COURT:  -- are working on the transcript.

 3                MR. UNDERHILL:  I completely understand.

 4                So Mr. Dunlap and I -- I hope it was an

 5     oversight -- said -- talked about bringing a second lawsuit.

 6     The jury was never supposed to know that there was a first

 7     lawsuit.  That was a ruling from --

 8                MR. DUNLAP:  I think that --

 9                MR. UNDERHILL:  -- Judge Love.  It was.

10                MR. DUNLAP:  That's not the ruling.  It's not

11     correct.

12                MR. UNDERHILL:  It is.  I'll get it --

13                MR. DUNLAP:  It is not.

14                MR. UNDERHILL:  Tom --

15                THE COURT:  Wait -- wait a second.  Guys --

16                MR. UNDERHILL:  I'll get you -- I'll get you the

17     transcript.  I don't have it right now.

18                But, Your Honor, I think it's completely improper.

19     They should not know that there's another lawsuit out here.

20     It doesn't have anything to do with the issues here in this

21     case.

22                THE COURT:  Okay.  Do you want to say anything now

23     about that?

24                MR. DUNLAP:  Your Honor, just my recollection -- I

25     think Mr. Findlay can support this.  Judge Love said we
```

```
 1   could say there was a lawsuit.  We could say there was a
 2   patent.  We couldn't say what the lawsuit was, what happened
 3   in the lawsuit, or what the ruling was.
 4           THE COURT:  Or anything that happened in between.
 5           MR. DUNLAP:  Exactly.  Which I did not do.
 6           THE COURT:  That -- that is what I understand.
 7           MR. UNDERHILL:  If I -- if I'm wrong, I'm wrong.
 8   That's my recollection.
 9           THE COURT:  Okay.
10           MR. UNDERHILL:  A second thing, Your Honor, he said
11   that they're going to -- we're going to hear -- the jury's
12   going to hear about the victims that Telebrands bullied.
13           I'd like to know who these victims are.  I'm going
14   to object.  If we're talking about Malone and ZURU, then,
15   fine, you can say that they were victims of bullying, but if
16   there are --
17           MR. DUNLAP:  That's it.
18           MR. UNDERHILL:  -- supposedly other ones -- that's
19   fine.
20           And then this red zone analogy.  They had a slide
21   last night, Your Honor.  80 percent is what they're saying
22   is for clear and convincing evidence.
23           THE COURT:  I didn't hear an objection to that this
24   morning, Mr. Underhill.
25           MR. UNDERHILL:  On the --
```

1          THE COURT:  We were back here, and -- and we talked

2     about --

3          MR. DUNLAP:  We deleted the slide.

4          MR. UNDERHILL:  Oh, they did?  Okay.  Okay.  That's

5     right.  That's right.  They did take it out.  We said it's a

6     problem, take it out.

7          Now they're doing the red zone thing, which is a

8     backdoor way of getting into it.

9          THE COURT:  Well, you know, you didn't instruct in

10    openings, and I understand why you didn't, but I want to

11    avoid that discussion about where that line is.  I don't --

12    I'm not sure what the red zone means, so I would prefer not

13    to hear that again.

14         MR. FINDLAY:  Fair enough.

15         MR. MALDONADO:  One more issue I wanted to raise,

16    and this is another MIL that we had regarding Telebrands'

17    business practices, and that is reference it's their

18    pattern and business product to copy other people's

19    products.

20         And Judge Love said he wanted to see whatever

21    evidence they were going to put on to establish that pattern

22    of business practice.

23         And I believe that they have -- and the exhibits

24    that they tried to get in were excluded, and so we have a

25    problem with referring to a business pattern or practices

```
 1    not supported by any --
 2              THE COURT:  Is something going to come in on that?
 3              MR. DUNLAP:  Yes, Your Honor.
 4              So first I'll proffer that the three emails that we
 5    supplied show them copying Balloon Bonanza, which was the
 6    first thing they copied, not the thing that they copied in
 7    this case.  So at a minimum, you have two things that we've
 8    already put in.
 9              MR. UNDERHILL:  What are the two?
10              MR. DUNLAP:  Balloon Bonanza and Battle Balloons.
11              MR. UNDERHILL:  Okay.  Battle Balloons wasn't
12    copied.  There's no evidence that it was copied.
13              MR. DUNLAP:  It's our --
14              MR. UNDERHILL:  That's what we say in our lawsuit.
15    That's what the lawsuit says.  That's why we're here.
16              THE COURT:  Just one at a time.
17              MR. UNDERHILL:  Sorry, go ahead.
18              THE COURT:  And -- and let me also remind you, my
19    rule up here is one person at a time.
20              MR. UNDERHILL:  Yes, Your Honor.
21              MR. DUNLAP:  Yes, sir.
22              THE COURT:  I understand this is a little different
23    because we're talking about a number of issues.  But -- but
24    if -- if we break the rule, I promise you I'll remind you.
25              MR. UNDERHILL:  Thank you.
```

 1            MR. DUNLAP:  Thank you.

 2            MR. UNDERHILL:  Yes, sir.

 3            Okay.  I -- I would also -- this -- this is going

 4    to be a theme, it already has been a theme.  That's what Mr.

 5    Findlay did, where, you know -- we copy all the time and all

 6    this kind of stuff.

 7            They accuse us of copying Balloon Bonanza when

 8    there's not even a product.  Your Honor, I would like to use

 9    the slide that we couldn't use in opening where we show that

10    ZURU does exactly the same thing with other witnesses.

11            May I do so?

12            MR. DUNLAP:  So, Your Honor, we'd object to that

13    because there's -- we haven't seen it before today, and I

14    don't know, for example, the slide they used, what that

15    product is that they're alleging they copied.  I don't -- I

16    haven't seen those games.  I don't know if it's a copy.  And

17    I'm 99 percent sure that there's no patent on that product,

18    so it's completely not analogous to this.

19            THE COURT:  Mr. Underhill.

20            MR. UNDERHILL:  Yes, Your Honor.

21            THE COURT:  You'll provide with me the -- provide

22    me with it again.  I'm not sure in all this paper I can put

23    my finger on it.

24            MR. UNDERHILL:  I'll do it, sir.

25            THE COURT:  But if you'd provide me with it again,

```
 1   I'll look at it.
 2           MR. DUNLAP:  Okay.  Thank you, sir.
 3           THE COURT:  And then I'll give you an --
 4           MR. UNDERHILL:  Thank you, Your Honor.
 5           THE COURT:  -- opportunity to speak to it again.
 6           MR. DUNLAP:  Thank you very much.
 7           THE COURT:  Okay.  Anything else?
 8           MR. UNDERHILL:  Thank you.
 9           THE COURT:  Thanks.
10           (Bench conference concluded.)
11           MR. LEE:  Your Honor, what time do you want us back
12   in --
13           THE COURT:  Probably at this point five minutes or
14   so.
15           (Recess.)
16           COURT SECURITY OFFICER:  All rise.
17           THE COURT:  Let's have the jury brought in, please.
18           (Jury in.)
19           THE COURT:  Please be seated.
20           Counsel, does either party wish to invoke the Rule?
21           MR. DUNLAP:  Yes, Your Honor, we'd like to invoke
22   the Rule.
23           THE COURT:  All right.  Very well.
24           Ladies and gentlemen in the gallery, what that
25   means is that the Rule of the Court has been invoked, so to
```

1    the extent there are any witnesses other than expert

2    witnesses, any witnesses who are in the courtroom must

3    retire from the courtroom and remain outside of the presence

4    and the hearing of the proceedings here in the court.

5           So you should -- you're certainly welcome to visit

6    with the attorneys during the course of the trial, but don't

7    discuss the case among yourselves or with anyone else.

8           And, of course, expert witnesses are not included

9    in the Rule.

10          MR. UNDERHILL:  Your Honor, is it also the case

11   that a representative for each party is also not included in

12   the Rule?

13          THE COURT:  No, I think a representative from the

14   parties may stay.  Is that -- any objection to that?

15          MR. UNDERHILL:  That's what I mean.

16          THE COURT:  Yeah.

17          MR. UNDERHILL:  That's what I want to clarify.

18          THE COURT:  Any objection to that, Mr. Dunlap?

19          MR. DUNLAP:  No objection, Your Honor.

20          THE COURT:  Oh, yeah, certainly, they may stay.

21          MR. UNDERHILL:  Thank you.

22          THE COURT:  Okay.  Do the parties wish to move

23   exhibits into the evidence at this time?

24          MR. DUNLAP:  We do, Your Honor.  I've got the --

25   got the exhibits from Mr. Malone.

```
 1              Do we have the other exhibits?
 2              MR. FINDLAY:  Before we do that, Your Honor, we
 3  have a pre-admitted list for everything, if that's what Your
 4  Honor would want.
 5              THE COURT:  Yes.  For -- for everything other than
 6  just today?
 7              MR. DUNLAP:  Yes, Your Honor.
 8              MR. FINDLAY:  Yes, Your Honor.
 9              THE COURT:  Okay.
10              MR. DUNLAP:  The entire case.
11              THE COURT:  All right.
12              MR. DUNLAP:  May I approach?
13              THE COURT:  You may.
14              MR. DUNLAP:  These are Plaintiffs' Exhibits, Your
15  Honor.
16              THE COURT:  Okay.  And are these exhibits agreed to
17  by the parties?
18              MR. DUNLAP:  They are, Your Honor.  They're the
19  ones -- yes.
20              MR. LOVE:  Your Honor, we haven't seen the binder
21  yet for this witness.
22              THE COURT:  Okay.
23              MR. DUNLAP:  No, this is -- this is all the
24  exhibits.
25              MR. LOVE:  Okay.
```

```
 1              MR. DUNLAP:  That were pre-admitted.

 2              MR. LOVE:  Okay.

 3              MR. FINDLAY:  After the pre-trial conference.

 4              MR. LOVE:  Okay.

 5              THE COURT:  So Mr. Love, those are -- those are

 6    agreed to without objection.

 7              Hold on one at a time.  Okay.  So Mr. Love.

 8              MR. LOVE:  Your Honor, we -- we haven't seen that

 9    list that you have.  We don't know what's on that --

10              THE COURT:  All right.

11              MR. LOVE:  -- particular list.

12              THE COURT:  Mr. Dunlap, would you provide him with

13    a copy?

14              MR. DUNLAP:  I will, Your Honor.  This -- this is

15    just the -- the exhibits that were pre-admitted after the

16    pre-trial.

17              THE COURT:  Well, Mr. Dunlap, just provide it to

18    them, and let's give them an opportunity to --

19              MR. DUNLAP:  Absolutely, Your Honor.

20              THE COURT:  -- review it, and we will handle this

21    later.

22              MR. UNDERHILL:  So, Your Honor, we're just trying

23    to understand.  Are you moving all these exhibits in now?

24              MR. DUNLAP:  Yes.

25              MR. UNDERHILL:  We -- Your Honor, we'd ask for
```

1    copies of them if he's going to use them with a witness.

2         THE COURT:  Well, with respect to the list you've

3    got in your hand, Mr. Underhill, I'm going to give you all

4    an opportunity to review that later.

5         MR. LOVE:  It's pretty long.

6         THE COURT:  Let -- yeah, let's don't delay anything

7    further.

8         With respect to the witness, though, are there

9    exhibits you want to move in at this time with respect to

10   the first witness?

11        MR. DUNLAP:  Your Honor, if we're going to -- we

12   were going to wholesale move all those exhibits in.  I can

13   move these exhibits for this witness in right now.

14        THE COURT:  Okay.

15        MR. DUNLAP:  If that would work.

16        THE COURT:  Let's do that.

17        And have those been provided to the other side?

18        MR. LOVE:  Not yet.

19        THE COURT:  All right.  So we're going to do this

20   one at a time.

21        And you may call your first witness.

22        MR. DUNLAP:  Thank you, Your Honor.

23        Your Honor, the Plaintiffs would call Mr. Josh

24   Malone, please.

25        THE COURT:  Mr. Malone, if you would please stand

 1   and raise your right hand.

 2          (Witness sworn.)

 3          MR. DUNLAP:  Your Honor, may I approach the witness

 4   with a copy of the exhibits?

 5          THE COURT:  You may.

 6          MR. DUNLAP:  Thank you.

 7          And, Your Honor, this is a copy of the

 8   demonstratives we'll be putting on the screen.

 9          THE COURT:  Very well.

10          MR. DUNLAP:  Thank you.

11          JOSH MALONE, PLAINTIFFS' WITNESS, SWORN

12                      DIRECT EXAMINATION

13   BY MR. DUNLAP:

14   Q.  Good afternoon, Mr. Malone.  Can you please introduce

15   yourself to the jury?

16   A.  Yes.  I -- I am Josh Malone.

17   Q.  Okay.  Mr. Malone, please tell your -- the jury --

18          THE COURT:  Mr. Dunlap?

19          MR. DUNLAP:  Yes?

20          THE COURT:  Is that mic, perhaps, off?

21          MR. DUNLAP:  It's not.  Yeah.

22          THE COURT:  That's it.  Is that better?

23          MR. DUNLAP:  I think so, Your Honor.

24          THE COURT:  Okay.  Thank you.

25          MR. DUNLAP:  Sorry about that.

1    Q.  (By Mr. Dunlap)  Mr. Malone, can you please tell the

2    jury about your relationship to the Plaintiff company in

3    this case, Tinnus Enterprises?

4    A.  Sure.  I'm -- I'm the -- the founder and the owner of

5    Tinnus Enterprises.

6    Q.  Okay.  What does Tinnus stand for?

7    A.  Well, Tinnus is an acronym.  It comes from the book of

8    Ecclesiastes.  And it means there's nothing new under the

9    sun, Tinnus.

10   Q.  And when did you form Tinnus?

11   A.  In 2006.

12   Q.  Can you please tell the jury a little bit about your

13   personal background?

14   A.  Sure.  I was born in Dallas, Texas, in 1973.  I was

15   raised in the small town of Van Alstyne.  It's about 40

16   miles north of Dallas.  I grew up there, went to school

17   there.

18          I went to college and studied mechanical

19   engineering.  And toward the end of college, I met my wife,

20   Alison, who's here today.

21          And we got married, we moved to Plano, just north

22   of Dallas, in 1996.  And we've lived there ever since, and

23   that's where we've raised our eight children, as well.

24   Q.  Okay.  And can you tell me about your career path after

25   college?

1    A.   Sure.   My first job was at Texas Instruments.   I was a

2    mechanical engineer and process engineer.   I worked in the

3    DLP division.   We made the microchips that go in the

4    projectors, in microprojectors and digital cinema.

5          That was -- I spent 10 years, 10 -- about 10 years

6    at Texas Instruments and kind of moved up the ranks a bit,

7    and loved it.   It was a great company.   I learned a lot.

8    Added a lot of skills.   Was able to contribute a lot to

9    the -- to the technology.   But that came to an end in 2006.

10   Q.   Okay.   What do you do for a living now, Mr. Malone?

11   A.   Now, I'm a -- I'm a full-time inventor and also a

12   consultant.

13   Q.   Okay.   How -- and tell us a little bit about you being a

14   full-time inventor.   How has that affected you personally?

15   A.   Sure.   Well, it was a big decision, so as I mentioned,

16   at TI, the -- it was a fantastic experience, but it got a

17   little bit stifling.   So I had some ideas for improvements

18   to the products and -- and better ways of doing things; and

19   just in a big company, at some point, your -- your voice

20   just kind of gets drowned out in all the busyness and other

21   priorities.   And I also had some ideas I also wanted to do

22   for -- for my own on the side in other fields.

23          And I had one particular idea during this time, and

24   it just is one that just wouldn't let go of me.   It just --

25   every year I kept thinking about this -- this problem I

1   wanted to solve.

2           And I was telling Alison about it one day, and I

3   said I think I -- I think I need to do this -- this full

4   time.  It's not a -- I can't get it done on the side.  I'm

5   too busy.  She kind of understood.  She kind of knew me by

6   now.  We've been married for 10 years.  And so she kind of

7   supported that idea.

8           And a few days later, I came home from work, and I

9   told her, well, I gave them my two weeks' notice, meaning

10  I'm going to resign.  And she was -- she was -- she was

11  stunned.  She said, what?  You did what?  You quit your job?

12  And she -- I guess she had thought that was more of a

13  hypothetical discussion the week before.

14          But we actually sat down and had a really -- a

15  really -- a heart-to-heart talk about -- we thought this is

16  a -- this is a big risk.  It's a big investment.  Leaving a

17  stay, paying job, trying to take on this -- this adventure

18  and starting your own business, trying to do an invention is

19  a high risk -- it's a high-risk business, no matter what.

20          And we said, we can try this.  You know, we're --

21  we're in our mid-30s.  Odds are against us.  If it doesn't

22  work out six months, 12 months later, go back -- go back to

23  the corporate world and -- and -- and rebuild.

24          So we made a conscious effort to -- to take that

25  chance, take the plunge.  So I'll tell you the -- the

1  actual -- the problem I wanted to solve at this time was one

2  that she -- Alison and her friends and her mom had -- had

3  faced.

4          And so they were involved in activity of

5  scrapbooking and making memory books.  And so at this point,

6  rather than just pasting the pictures in there straight and

7  then moving on to the next one, they would actually make an

8  artistic project.  So they would lay them out and decorate

9  them.

10          And one of the ways to decorate them was to cut out

11  letters and shapes out of paper and card stock and glue them

12  down and arrange them, and that was a hard thing to do.

13          So they would do it by hand with scissors.  It

14  would take a long time.  Other people would purchase these

15  bulky, expensive tools -- industrial tools really to do the

16  job.

17          And I just -- I knew that wasn't the best way to do

18  it, and I came up with this design.  It's an electronic

19  motorized paper cutter, and called it the slice -- portable

20  cutter.  It was battery powered, and -- and had electronics

21  in it.  And it actually solved the problem.

22          They were able to cut these thousands of shapes

23  with this one -- this one tool.  And I took it, took it to

24  market.  I found a company that agreed to license it, a

25  company called Making Memories.  They took it to -- they

1  took it to market, and so that was my start.  And that's

2  pretty much what I've been doing ever since.

3  Q.  Mr. Malone --

4        MR. DUNLAP:  Your Honor, may I approach the

5  witness?

6        THE COURT:  You may.

7  Q.  (By Mr. Dunlap)  Mr. Malone, can you identify this,

8  please, for me?

9  A.  Yep.  This is my -- this is my latest invention, Bunch O

10  Balloons, like we discussed earlier.

11  Q.  Can you explain very briefly how it works?

12  A.  Sure.  The -- well, just like the video, but, of course,

13  you connect it to the hose, and you turn on the hose, and

14  the water goes through the tubes into the balloons.  And

15  they fill up.

16        And when they're full, you shake it, and they fall

17  off, and then the elastic ring around the balloon seals the

18  water inside and you got your water balloons.

19  Q.  Okay.  And if you look at your screen, is that the first

20  version of Bunch O Balloons you made?

21  A.  That's the -- that's the early production version.

22  Q.  Why did you pick green?

23  A.  There may have been a survey, but it also might have

24  been an executive decision.  I just like green.

25  Q.  And how many straws are in this version?

1  A.  In the original, there's 37 tubes, so -- yeah, there's

2  37.

3  Q.  Okay.  So once you -- now, can you tell me a little bit

4  about how you -- the inventive process?  How did you come up

5  with the idea?  What was the -- the ah-ha moment?

6  A.  So like a lot of problems, it was something that just --

7  I dealt with personally and I saw other people deal with,

8  and that was filling and tying water balloons.  And so it's

9  something I did as a kid.

10      I took a break because I guess I wasn't a kid, but

11  then I had my own kid,s and so it was an excuse to play with

12  water balloons again.

13      And I was the one that would -- I was very

14  dedicated to it, so I would -- I would buy the 500-pack and

15  I'd bring them home, the kids were having a water balloon

16  fight, and we'd go to fill our balloons, and no, you can't

17  start until we're done filling them.

18      And so like an hour-and-a-half later, kids are --

19  you know, dad, can we have a fight now?  No, we're not done

20  yet.  But all these hours and all these summers, I thought

21  there there's got to be a better way.  And I came up with

22  some ideas and concepts.

23      And, finally, I -- I got the idea of putting an

24  elastic ring -- a little tiny rubber band around the neck of

25  the balloon, and I just -- I thought maybe that will seal

1 the balloon.

2         And I got a ring, and I got it -- it was difficult,

3 but I got it around the neck of the balloon.  And I had an

4 empty balloon with a ring around it, and so I thought that

5 might seal.

6         Now I've got to get the water in.  So I got a

7 slender straw or a tube, and I finagled it in through the

8 neck of the balloon, opened up the elastic ring.  And so I

9 thought now I've got a passageway to put the water in, and

10 the other end of the tube now has -- has got to be connected

11 to the water.

12         And so I thought maybe I could connect it to a

13 garden hose.

14         So I got one of those caps that goes in the end of

15 a garden hose to plug it off.  I put a hole in the cap, I

16 glued the tube in the end of the cap.  And I looked at it.

17 And I thought that's a really lonely tube.  Maybe I could --

18 maybe it needs some friends.

19         And so I didn't even test it.  I went ahead and

20 calculated how many holes I could fit in the end of that

21 cap, and it came out to 37.

22         I filled it full of holes, and I glued a tube in

23 each one.  And it looked a lot like this or the green one

24 here, I guess.

25         And at this point I wasn't certain it would work.

84

```
 1   It seemed like a good idea.  I took it out back and
 2   connected it to the hose, and it worked pretty much like --
 3   like the video we saw earlier.  And that was -- that was the
 4   magic.  That was the eureka, I think I've solved it.
 5   Q.  So once you had the invention complete, what did you do
 6   next?
 7   A.  Well, I filed for a patent.
 8   Q.  And when was that?
 9   A.  That was February 7th of 2014.
10   Q.  Okay.  And after the patent, what were your plans?
11   A.  Well, the plans were to take -- so the pictures and
12   samples we've been looking at today are pretty polished.
13         Well, my first one was -- was not this pretty.  It
14   was very crude hand-built, so I knew I needed to figure out
15   how to build that in mass production.  I need to be able to
16   make this cost effectively, high quality, and make it buy --
17   you know, thousands of them, if not more.
18         And so I started looking at working on the design,
19   preparing for production, and working with suppliers and
20   materials and equipment.  And I realized I'm going to need
21   some capital, some money to go take this next step.
22   Q.  Okay.  And how did you plan to get that money?
23   A.  Well, so there's -- I mean, the conventional way of
24   getting money is ask your friends and family, I guess, or --
25   or go find investors, venture capital, and that's hard and
```

 1  complicated.

 2          At this time, it was -- I remembered the idea of --

 3  of crowdfunding.  And so I looked into it.  I contacted a

 4  consulting company and decided to put the product on

 5  Kickstarter, and -- and see if I could raise money that way.

 6  Q.  Okay.  I'm going to show you a video, Mr. Malone, and

 7  then ask you some questions about it.

 8          MR. DUNLAP:  Would you please join me in watching

 9  the screen?  Thank you.

10          (Videoclip played.)

11  Q.  (By Mr. Dunlap)  Mr. Malone, who were the actors in the

12  video?

13  A.  Those are my children.

14  Q.  Okay.  And how did you produce the video?

15  A.  Well, a friend of my oldest daughter, she was -- she was

16  18 at the time, she had a couple of friends that were

17  amateur or semi -- semi-pro filmographers, videographers,

18  and so I retained them to produce this video.  Some

19  teenagers.

20  Q.  I noticed --

21          THE COURT:  Mr. Malone, would you raise that

22  microphone a little bit closer?

23          Yeah, thank you.

24  Q.  (By Mr. Dunlap)  Mr. Malone, did -- I noticed in the

25  video you compared your Bunch O Balloons products to some

1    other ways to fill and tie water balloons.  Can you tell me

2    what those are and why yours is different?

3    A.  Sure.  Those were the -- that was the state of the art

4    at the time.  So the old-fashioned way is filling them by

5    hand and tying them with a -- with a knot.

6           And then there was another one that was called the

7    Tie-Not, it was a device that helps tie -- it's a tool to

8    help tie the knot.

9           And the other one was a product called ZORBZ that

10   had just recently appeared on the market, which has a -- a

11   small capsule inside the balloon that seals the neck of the

12   balloon.

13   Q.  Okay.  And after you finished making this video, where

14   did the video go?  What did you do -- how does it work with

15   Kickstarter?

16   A.  Well, the video goes on -- on the web page of the

17   Kickstarter site along with a description of the product,

18   and a proposition to the -- to the viewers to donate funds

19   to the project.

20   Q.  Okay.  I've put up Plaintiffs' Trial Exhibit 54 on the

21   screen.  If you can take a look at that.

22          Can you tell me how much were you looking to raise

23   with this campaign when you first started it?

24   A.  The goal was set at $10,000.

25   Q.  Okay.  And who helped you -- in addition to your wife

1  and kids -- make the video, who helped you with the

2  Kickstarter website and project?

3  A.  I may be forgetting a few people, but I do remember my

4  mother-in-law helped with some of the graphics, and as well

5  as the consulting company I mentioned earlier.  They're

6  called Command Partners.  They're experts at crowdfunding.

7  They were our -- those were the people that helped.

8  Q.  Okay.  And how did you pick Command Partners?

9  A.  Command Partners is on a -- an arrangement where they --

10  they have a small, flat fee -- or it wasn't small, but it

11  was a flat fee, and then they get a contingency or a

12  percentage of the funds that you raise if it's successful.

13  Q.  Okay.  Mr. Malone, can you, for members of the jury who

14  don't know what that means, what is the contingency

15  arrangement, how does that work?

16  A.  Oh, sure.  The -- so what happens, we set the goal at

17  $10,000, and the consultant, they charge us an up-front

18  price.  I think we paid them $2,500.

19        And then -- but they also get -- if we meet the

20  goal, we raise $10,000, they're going to take -- they're

21  going to keep 10 percent of whatever we raise.  So if we

22  raise 10,000, they get to keep a thousand, et cetera.

23  Q.  And do you know, do they sell their services to other

24  Kickstarter project companies?

25  A.  Yes.

1  Q.  Okay.  And do you know how many other companies work

2  with Command Partners?

3  A.  I'm not certain.  I think there's been at least a

4  hundred.

5  Q.  Okay.  Let's talk about the website contents themselves.

6        What was the initial price to pledge to purchase a

7  package of Bunch O Balloons?

8  A.  Yeah, so we proposed -- or we asked for a 15-dollar

9  donation in exchange for one package of Bunch O Balloons.

10  Q.  Okay.  And how many sales did you make?

11  A.  We ended up with 21,455 orders.

12  Q.  And what was the total raised?

13  A.  $929,000.

14  Q.  So going back to the contingency arrangement, how much

15  did Command Partners end up getting?

16  A.  Well, they got 10 percent, so about $90,000.

17  Q.  So it was a pretty good project for them, as well?

18  A.  Yes.

19  Q.  Okay.  What happened after the Kickstarter campaign's

20  success?

21  A.  Well, part of the -- I mean -- you mean after the

22  success or -- or --

23  Q.  Yes.  So after you started the Kickstarter campaign,

24  clearly a lot of people signed up, did anyone contact you?

25  A.  Sure.  So this was the final total after 30 days, but it

1   really got crazy on day two.  So there was -- you know, a

2   lot of donations, and then it went viral at that point.

3           So there were some articles written on blogs and --

4   and online news sites.  And after that, it went mainstream.

5           So local news called, TV -- we ended up, the TV

6   crews came out to my house, Good Morning America ran a

7   story.  And then the Today Show came out, as well.

8           I see on the screen some of the examples of the

9   entries that were covering the -- the excitement on the

10  second day.

11  Q.  Okay.  Mr. Malone, I'm going to play you the Today Show

12  video.  Could you join me in watching it, and I'll ask you

13  some questions about it afterwards.  Thank you.

14          (Videoclip played.)

15  Q.  (By Mr. Dunlap)  So, Mr. Malone, can you tell me what

16  Mr. Carson Daly is doing over in his bucket?

17  A.  Well, he had to fill his water balloons the old fashion

18  way.

19  Q.  And who won the water balloon fight?

20  A.  Well, since I'm under oath, I confess that it was a

21  draw.  Neither one of us landed -- landed a shot in that

22  fight.

23  Q.  So after the Today Show appearance, did you continue to

24  sell these water balloons on your own?

25  A.  Yes.

1  Q.  Okay.  What -- how did you do that?

2  A.  So the Today Show appearance was in the -- after the

3  first week of Kickstarter, and it -- and so Kickstarter

4  continued for three more weeks, or 30 days total.

5        So at the end of August, we -- at the close of the

6  Kickstarter, I launched a website to sell directly to the

7  customers, as well.

8  Q.  Okay.  Was that in the name of your company?

9  A.  That was -- the site that was -- I mean, it was my

10  company offering the products, and the site was

11  bunchoballoons.com.

12  Q.  And how many orders did you sell on your Bunch O

13  Balloons site?

14  A.  Altogether about -- it was about a 100,000 packs.

15  Q.  And how -- what was the price per pack on the Bunch O

16  Balloons site?

17  A.  We were selling for $17 per pack.

18  Q.  Okay.  So after that time, were you contacted by people

19  who wanted to license from you?

20  A.  Yes.  Actually, the contacts began during the

21  Kickstarter campaign.  So I think a lot -- you know, a lot

22  of the industry saw it and retailers saw it, so I heard from

23  the -- the biggest retailers in the country, and they're

24  asking me, you know, for a million units.  And I have tell

25  them I'll -- I can't provide that many.  I've got my hands

1   full with Kickstarter.

2          And, fortunately, there were some -- some

3   manufacturer -- toy -- toy manufacturers, other

4   manufacturers, as well, contacting me about licensing.  So

5   they could produce it for me.

6   Q.  And so how did you come in contact with ZURU then?

7   A.  Well, so I heard from several companies, some of them

8   pretty big names, I think Hasbro, we had a conversation

9   about this product.

10          And, eventually, ZURU got to me.  So Ms. --

11  Mr. Nick Mowbray from ZURU had sent me an email, I think, on

12  the second day of Kickstarter.  And I was just kind of -- it

13  was crazy, and I just didn't see it.  It just got buried in

14  my in box.

15          I think he emailed a few days later, and I missed

16  it again.  But I guess the guy is really persistent because

17  on his third try I opened his email, and I -- and I read

18  his -- I read about his company, a short introduction, and

19  that started off a conversation about the potential for

20  partnering with ZURU.

21  Q.  What did you read about his company?

22  A.  So he just gave me a little background.  So he explained

23  how they started -- it's a family business.  They started in

24  New Zealand.  They -- they had -- they had had some success

25  in the toy business, but they were still kind of a newcomer.

1   But they had a really -- they had a really special approach

2   to the problem of -- of Bunch O Balloons.

3          So I knew I had a big challenge ahead to produce

4   the massive quantities of these that we needed.  To make it

5   fast, we had to get it to market by the next season.  And to

6   make it high quality.

7          And if you think about it, it's -- there's a lot of

8   parts here.  And so there's a lot of -- it would be very

9   complicated to build this by hand.  And so ZURU said, look,

10  we know how to build this with automated processes.  And I

11  was from Texas Instruments.  I knew that would be like a

12  massive multi-million-dollar project.  It would take many,

13  many years.

14         And Nick -- Nick reminded me -- or he showed me

15  some of the work his brother Mat had done, and he convinced

16  me they could do this project, and they could do it quickly.

17         And I was -- well, I'll tell you, I was -- they

18  were -- it was -- I was persuaded enough to go and visit

19  with them.  And by the time I arrived, they showed me their

20  design for the fact -- for the machine that would build

21  this, and I knew they were on the right track.

22  Q.  Did you enter into any agreements with the ZURU

23  companies?

24  A.  Yes, I did.  It was -- it was -- it was a good fit.

25  They knew what needed to be done, and we did a deal.  And it

```
 1   was -- it was August 19th.  I think it was three days --
 2   three days -- it was still Kickstarter.  It was three days
 3   before it was over, we signed the licensing agreement.
 4   Q.  And could you please look at Plaintiff's Trial Exhibits
 5   55, 56, and 57?  And there should be copies in the binders
 6   in front of you.
 7        Can you tell me, are those the license agreements
 8   you entered into with ZURU?
 9   A.  Yes.
10   Q.  Okay.  Now, I'm going to turn to some questions about
11   Telebrands.  When did you first learn about the company
12   Telebrands?
13   A.  It was December of 2014.  It was only four months after
14   the Kickstarter campaign.  ZURU and I were busy building
15   this -- this factory and preparing to take -- take this
16   product to market.
17        And my wife brought it -- brought to my attention a
18   text message she had received from a friend that said:  I
19   saw your husband's invention Bunch O Balloons on TV, and it
20   was a copy.
21        And at first I was -- I was not concerned.  I told
22   her -- I assured my wife that -- that's not possible.  It's
23   probably some other device that fills water balloons.  And
24   her friend wrote back and said:  No.  I know it's exactly
25   it.
```

```
 1              And so I did some research, and I was stunned to
 2    find a commercial that was running on TV that was exactly --
 3    it was my invention by a different name.
 4    Q.  I'm going to show you the commercial and then ask you
 5    some questions about it.
 6              MR. DUNLAP:  Please join me in watching the
 7    commercial.
 8              (Videoclip playing.)
 9              MR. LOVE:  Your Honor -- Your Honor?
10              THE COURT:  I'm sorry.
11              MR. LOVE:  Can we approach?
12              THE COURT:  Stop -- can we stop the video?
13              MR. LOVE:  Can we approach, Your Honor?
14              THE COURT:  Yes.
15              (Bench conference.)
16              MR. UNDERHILL:  I'm sorry.
17              MR. LOVE:  Okay.  False alarm.  We thought this was
18    a different video than what they had produced.
19              THE COURT:  Okay.
20              MR. LOVE:  Apologies.
21              (Bench conference concluded.)
22              MR. DUNLAP:  Your Honor, can we finish the video?
23              THE COURT:  You may.
24              MR. DUNLAP:  Thank you, Your Honor.
25              (Videoclip played.)
```

1   Q.  (By Mr. Dunlap)  Mr. Malone, this is Plaintiff's Trial

2   Exhibit 41.  When did you see this commercial?

3   A.  That same day, in December of 2014.

4   Q.  And what was your reaction when you saw this commercial?

5   A.  It was -- it was a punch in the gut.  It was just -- I

6   was stunned, deflated, nervous, scared.  It was just

7   mixed -- totally mixed emotions because this was -- I didn't

8   know what happened.  I mean, this was -- what do I do now,

9   is kind of my initial reaction.

10  Q.  Okay.  And did you -- what did you -- what does this

11  video show?

12  A.  Well, it's -- it's my product, and it's -- it's

13  virtually everything I had done for Kickstarter in that

14  video and my product.  And it's just -- it's just all, you

15  know, spruced up, I guess, if you -- if you like that kind

16  of style.

17  Q.  Who are the actors in the commercial?

18  A.  I don't know.

19  Q.  Okay.  How many bunches are in each package in this

20  commercial?

21  A.  Three.

22  Q.  How many were in your product, your Balloon Bonanza

23  (sic) product that you were selling in July?

24  A.  Mine was Bunch O Balloons.

25  Q.  Bunch O Balloons.  Sorry.  I apologize.  How many were

1    in your Bunch O Balloons product that you were selling in

2    July?

3    A.   Three stems.

4    Q.   And did this commercial come out after your Kickstarter

5    commercial?

6    A.   Yes.  Like I said, it was about four months after.

7    Q.   Okay.

8            MR. DUNLAP:  And the Kickstarter commercial, for

9    the record, is Plaintiff's Trial Exhibit 53.

10   Q.   (By Mr. Dunlap)  So did there come a time when

11   Telebrands stopped selling Balloon Bonanza?

12   A.   Yes.

13   Q.   Okay.  And did they start selling another product?

14   A.   Yes.

15   Q.   And what product is that?

16   A.   Battle Balloons.

17   Q.   And when did they begin selling that product, to your

18   knowledge?

19   A.   About one year later.

20   Q.   Okay.  What was the month and year, approximately?

21   A.   So it -- it may have been January of 2016, the best of

22   my recollection.

23   Q.   Okay.

24           MR. DUNLAP:  Your Honor, may I approach the

25   witness?

1          THE COURT:  You may.

2   Q.  (By Mr. Dunlap)  Mr. Malone, can you identify that

3   product?

4   A.  This is Battle Balloons.

5   Q.  Okay.

6          MR. DUNLAP:  And I'll represent that that's

7   Plaintiff's Trial Exhibit No. 40, I believe, Your Honor.

8   Q.  (By Mr. Dunlap)  And, Mr. Malone, did you obtain any

9   patents before this product was released?

10  A.  The -- the patents at -- the patents at issue today,

11  this -- the '749 and the '282 were filed at the same -- back

12  before I came to market with Bunch O Balloons.  So all the

13  patents at issue here were filed in February of 2014.

14  Q.  So I'm going --

15         MR. DUNLAP:  May I approach the witness, Your

16  Honor?

17         THE COURT:  You may.

18  Q.  (By Mr. Dunlap)  Mr. Malone, can you identify these?

19  A.  Yeah, this is -- these are -- these are my patents, the

20  '749 and the '282.  These are the original --

21  Q.  These are Plaintiff's Trial Exhibits 2 and Plaintiff's

22  Trial Exhibit 3.

23         So, I'm sorry, when did you file each of these

24  patents again?

25  A.  These both date to February 4th, 2014.

1    Q.  Okay.  And when was the first of those patents

2    published?

3    A.  The '749 was published -- so it was hidden -- it was --

4    it was not disclosed to the public, the original

5    publication, but on September -- September of 2014 -- no,

6    let me back up.  September of 2015, the '749 patent became

7    public, the application did.

8    Q.  Okay.

9    A.  And the -- I'm not sure about the '282, when it became

10   public.

11   Q.  Okay.  And when did these patents issue?

12   A.  The '749 issued officially on January 26th, 2016.  And

13   the '282 issued officially on April 19th, 2016.

14   Q.  Okay.  What prior art did you consider when you were

15   coming up with your -- when you were coming up with your

16   invention?

17   A.  As -- as I described, it was -- there wasn't any prior

18   art that really solved the problem.  So it was -- there

19   were -- there were tying devices, but there was nothing that

20   could fill and seal.  And so it was just -- it was from

21   scratch, as I described earlier.

22   Q.  Okay.  Now, when you filed your patent, did the United

23   States Patent and Trademark Office consider any prior art?

24   A.  Oh, yes, of course.

25   Q.  Well, you heard the prior art and saw the slides that

99

1  Mr. Underhill so graciously shared with us in his opening

2  statement.  Was any of that prior art considered by the

3  Patent and Trademark Office when you filed these patents?

4  A.  Yes, in fact, the examiner found most of the prior art,

5  and he looked at it specifically before issuing the patent.

6  Q.  Does it say that in the patent?

7  A.  I believe that the Saggio and the Donaldson reference,

8  and I think all of the references that the -- that

9  Telebrands has asserted here, render my invention obvious.

10         Every single one of those is listed on the patents

11  on one -- on Page 2 of the '282 patent, I believe they're

12  all there.  So that means the examiner considered it.

13  Q.  And he issued -- the examiner issued those patents

14  despite having found all of that prior art; is that correct?

15  A.  Well, not only the examiner, but the entire -- you know,

16  the director of the Patent Office signed off on that.

17  Q.  Okay.  And did there come a time when you amended the

18  '282 patent?

19  A.  Yeah, I -- I would like to clarify about amendments.

20         So there's -- the Patent Office is continually

21  examining, and the process is very involved.  And so an

22  amendment is a routine part of a patent application.  And

23  the '282 would have been amended at least once during its --

24  during the application process.

25  Q.  Okay.  Thank you.

1          I'm going to turn now to the Battle Balloons
2    television commercial.  This is Plaintiffs' Trial
3    Exhibit 43.
4          MR. DUNLAP:  Please join me in watching the Battle
5    Balloons commercial.
6          (Videoclip played.)
7    Q.  (By Mr. Dunlap)  Mr. Malone, what does this TV
8    commercial show?
9    A.  It's the same as the other one, it's my invention with a
10   different name.
11   Q.  Okay.  How is this video different from the commercial
12   for Balloon Bonanza?
13   A.  I didn't see any -- I didn't notice any differences.
14   Q.  Okay.
15         MR. DUNLAP:  Your Honor, may I approach the
16   witness?
17         THE COURT:  You may.
18   Q.  (By Mr. Dunlap)  Mr. Malone, can you tell me what that
19   is?
20   A.  This -- this is Balloon Bonanza, the -- the first
21   version.
22   Q.  Okay.  And can you hold that up next to Battle Balloons
23   for me?
24         Can you tell me how they're different?
25   A.  The difference is in the shape of the -- of the

1  connector, as I think Mr. Underhill had highlighted earlier.

2  Q.  Okay.

3  A.  That's the only difference.

4  Q.  And does the housing make the product different, work

5  any differently?

6  A.  No.

7  Q.  And does Battle Balloons infringe the '282 and '749

8  patents?

9        MR. LOVE:  Objection, Your Honor.  This question

10  calls for expert testimony.

11        MR. DUNLAP:  Withdrawn, Your Honor.

12  Q.  (By Mr. Dunlap)  Mr. Malone, you heard Mr. Love say that

13  you're not driving this boat.  Are you driving this boat,

14  this litigation?

15  A.  Yes, sir, I have -- I -- it's my only -- it's my only

16  recourse, and I hope that this will help to make them stop.

17  Q.  Who filed the suit against the retailers?

18  A.  My company did.  They were -- they continued selling the

19  copies of my inventions, so I had to.

20  Q.  Did ZURU tell you to file that suit?

21  A.  No, sir.

22  Q.  Is ZURU part of the retailer suit when you filed it?

23  A.  No, sir.

24  Q.  Okay.  And how is Battle Balloons better than Bunch O

25  Balloons, how is it an improvement on Bunch O Balloons, can

1   you tell me that?

2   A.  It's not an improvement, it's just a -- it's not an

3   improvement.

4   Q.  Okay.  And what are you asking the jury to do in this

5   case?

6           MR. LOVE:  Objection, Your Honor, this question

7   calls for a very broad narrative.

8           THE COURT:  Can you narrow the question, Mr.

9   Dunlap?

10          MR. DUNLAP:  Certainly, Your Honor.

11  Q.  (By Mr. Dunlap)  In your pleadings, you asked the jury

12  for certain relief, what's the relief you've asked the jury

13  for?

14  A.  Well, I -- I'm -- I hope -- I mean, I hope the jury -- I

15  expect the jury will consider all the evidence and the

16  testimony, including Telebrands.  And I hope and I think --

17  believe they will find that they did copy my invention, that

18  it infringes the patents and that they did so deliberately

19  and willingly.

20          And I hope that they will require that they pay

21  back to Tinnus and ZURU what's due for the damages they've

22  done, whatever that number is.

23  Q.  Mr. Malone, thank you very much for your time.

24          MR. DUNLAP:  Your Honor, just housekeeping, the

25  hard exhibits are Plaintiffs' Trial Exhibits 37, 39, and 40.

1    And I'd just move them in, as well.

2             THE COURT:  Any objection to those exhibits?

3             MR. LOVE:  No objection, Your Honor.

4             THE COURT:  All right.  Very well they will be

5    admitted.

6             Cross-examination?

7             MR. DUNLAP:  Thank you, Mr. Malone.

8             MR. LOVE:  May it please the Court.

9                      CROSS-EXAMINATION

10   BY MR. LOVE:

11   Q.  Mr. Malone, your title at Tinnus is founder and

12   president; is that correct?

13   A.  That's correct.

14   Q.  And correct me if I'm wrong, but as of June of this

15   year, you were the only employee of Tinnus, correct?

16   A.  Yes, sir.

17   Q.  And you personally are not a Plaintiff in this lawsuit;

18   is that right?

19   A.  Yes, sir.

20   Q.  Tinnus is the Plaintiff, along with ZURU, correct?

21   A.  Yes, sir, that's correct.

22   Q.  And that's ZURU Ltd., not ZURU Inc., correct?

23   A.  That's correct.

24   Q.  Other than you, Tinnus has no other officers or

25   directors; is that right?

1  A.  That's correct.

2  Q.  Meaning you're the only person at Tinnus, day in and day

3  out; is that true?

4  A.  Yes.

5  Q.  Now, your co-Plaintiff, ZURU, is a Chinese company; is

6  that right?

7  A.  I'm not sure where they're incorporated.

8  Q.  And I'm talking about ZURU Ltd.

9  A.  I understand.

10  Q.  You don't know where they're incorporated?

11  A.  Not at the moment, I don't recall.

12  Q.  Okay.  Well, you told the jury that it was a

13  family-owned New Zealand company; is that right?

14  A.  I don't recall.  There -- in my exact words, they are --

15  they started in New Zealand.  Ms. Mowbray is from New

16  Zealand, and they are -- they operate currently in

17  Guangzhou, China is my understanding, as well as offices in

18  Hong Kong.

19  Q.  Okay.  Well, you would agree with me -- and I know we

20  don't agree on much, but you would agree with me that ZURU

21  Ltd. is -- is a whole lot bigger than Tinnus, true?

22  A.  In terms of employees and -- I mean --

23  Q.  In terms of anything you can think of.

24  A.  Well, I mean, the name is shorter, but I guess otherwise

25  it's bigger.

1   Q.  So other than the name, right?  Is that a yes?

2   A.  I'd like you -- I mean, be more specific, and I'll be

3   happy to answer any specific questions about its relative

4   size.

5   Q.  Let's look at PTX-186.  And this is one of your

6   exhibits.

7          MR. LOVE:  And let's call out the -- the narrative

8   here under Company Overview for ZURU.

9   Q.  (By Mr. Love)  And we can see under PT-186 the words:

10  ZURU is a disruptive and award-winning company.

11         Did I read that correctly?

12  A.  Yes, sir, that's what it says.

13  Q.  Okay.  Have you ever seen PTX- -- PTX-186 before today?

14  A.  I don't recall.

15  Q.  You don't recall seeing it?

16  A.  No, sir.

17  Q.  Okay.  Were you aware that ZURU advertises that it

18  employs more than 400 staff and has 10 offices and supplies

19  most major retailers in a 120-plus countries?  Were you

20  aware of that?

21  A.  Not particularly, but it doesn't seem surprising to me

22  either.

23  Q.  Okay.  And were you aware that ZURU advertises itself as

24  one of the fastest growing companies in the toy industry?

25  A.  I think I have heard that before.

1   Q.  Okay.  Now, I want to talk a little bit about the

2   Balloon Bonanza commercial that we all saw earlier.

3           And that's at PTX-41.  You recall watching that

4   commercial?

5   A.  Yes, sir.

6   Q.  And you had said that -- you had first seen it in

7   December of 2014, correct?

8   A.  Yes, sir.

9   Q.  And you were stunned, right?

10  A.  Yes, I was.

11  Q.  And you were shocked, true?

12  A.  That's correct.

13  Q.  And you said you saw my product on TV; is that right?

14  A.  Yes.

15  Q.  Now, the product that we're talking --

16  A.  Let me correct -- I'm sorry.

17  Q.  Well, the product that we're talking about in the

18  commercial is Balloon Bonanza, right?

19  A.  I wanted to clarify.  You said I saw my product -- I

20  think I stated I saw my invention on TV, to be clear.

21  Q.  No, sir.  You said you saw your product on that

22  commercial.  Did you misspeak?

23  A.  I think that's not as clear as I saw my invention on TV.

24  Q.  Okay.  But, regardless, Balloon Bonanza is not an

25  accused product in this case.  You would agree with that,

1  wouldn't you?

2  A.  Yes, sir.

3  Q.  Now, let's talk about the '066 patent application.

4       MR. LOVE:  And I want to approach the witness, Your

5  Honor.

6       THE COURT:  Okay.

7  Q.  (By Mr. Love)  You held up these -- these two patent

8  documents for the jury to see.  One is the '282 issued

9  patent, correct?

10  A.  Yes, sir.

11  Q.  And the other is the '749 issued patent?

12  A.  Yes, sir.

13  Q.  Is that correct?

14       MR. LOVE:  Your Honor, may I publish this to the

15  jury?

16       THE COURT:  You may.

17       MR. LOVE:  If you would just pass that around.

18  Q.  (By Mr. Love)  Now, in your testimony, you -- I think

19  you said that the -- the '066 patent, you -- you had an

20  issued patent that looks like these, right?

21  A.  I don't remember saying that.

22  Q.  Well, did it come in a cover like this?

23       MR. DUNLAP:  I object.  He didn't say that, Your

24  Honor.  I don't remember that.

25       MR. LOVE:  I'll withdraw the question.

```
 1              THE COURT:  All right.
 2  Q.  (By Mr. Love)  Let me ask you this, Mr. Malone.  Did you
 3  get a fancy cover like this for the '066 patent, a document
 4  that had the nice seal on it for the '066 patent?
 5  A.  I don't recall.
 6  Q.  Okay.  Now, you're the named inventor of the '066
 7  patent, true?
 8  A.  Yes, sir.
 9  Q.  And it's entitled:  A System and Method For Filling
10  Containers With Fluids, right?
11  A.  So you're referencing the '066 patent.  Is that
12  something that I could look at --
13  Q.  Certainly.
14  A.  -- so I can answer your question?
15              MR. LOVE:  DTX-115.  We have it right here.
16              MR. FINDLAY:  May we approach?
17              THE COURT:  You may.
18              (Bench conference.)
19              MR. DUNLAP:  This is --
20              THE COURT:  Hold on.
21              MR. DUNLAP:  I'm sorry.
22              THE COURT:  Okay.  Let me also remind you at this
23  very early moment, I'm not going to hear objections from
24  multiple parties on one witness, okay?
25              MR. DUNLAP:  Sorry.  Go ahead.  I apologize.
```

1      THE COURT:  Both of you -- both of you -- both

2  sides have already violated that.

3      MR. FINDLAY:  It won't happen again.

4      THE COURT:  Okay.

5      MR. DUNLAP:  Your Honor, there's an MIL that's the

6  subject of this, and I'm totally fine if all we ever do is

7  talk about just this patent; but if it goes anywhere near

8  the Patent Trial and Appeals Board or litigation, I'm just

9  trying to make sure that does --

10      MR. LOVE:  It doesn't.

11      THE COURT:  It's not going to do that, is it?

12      MR. DUNLAP:  Okay.  That's all, Your Honor.  Thank

13  you.

14      (Bench conference concluded.)

15  Q.  (By Mr. Love)  So let's look at DTX-115, what we were

16  just looking at.  And we can see in the upper right-hand

17  corner, it says System and Method For Filling Containers

18  With Fluids, true?

19  A.  Yes, sir.

20  Q.  Now, you made a request for prioritized examination on

21  the '066 patent on August 19th of 2014; is that true?

22  A.  I don't --

23  Q.  Do you know what that is?

24  A.  I don't recall the dates, but I am familiar that we did

25  expedite this application.

1          MR. LOVE:  Well, let's look at DTX-205.

2  Q.  (By Mr. Love)  And we can see in the up -- the left-hand

3  corner here, you're the first named inventor, Joshua Malone.

4          Did I read that correctly?  And it's at Page 248 in

5  your binder if you're looking for it.  There's a -- there

6  should be a tab that's the file history for the '066 patent.

7  And you have it on the screen if you want to look at the

8  screen.

9  A.  I'll just rely -- I'll rely on the -- the screen.

10  Q.  Yes, certainly.  It will save all of our time.

11          You're the first named inventor, true?

12  A.  Yes.

13  Q.  And the title of the invention is System and Method For

14  Filling Containers With Fluid, right?

15  A.  Right.

16  Q.  Let's look at down here at the bottom.  We can see the

17  date.  It is August 19th of 2014.  Do you see that?

18  A.  Yes.

19  Q.  Now, according to the documents on file with the Patent

20  Office in the file history, you requested that the '066

21  patent be kept from the public, that it wouldn't be

22  published; isn't that true?

23  A.  No, sir, that's not correct.

24  Q.  All right.

25          MR. LOVE:  Well, let's look at DTX-205 at Page 245.

1   Q.  (By Mr. Love)  And we can see, again, this is

2   Application No. 14/492,487.  Did I read that correctly?

3   A.  Yes, sir.

4   Q.  And the filing date is September 22nd, 2014.  Do you see

5   that?

6   A.  Yes, sir.

7   Q.  And we see the words at the bottom, projected pub --

8   publication date:  Request for non-publication acknowledged.

9        Did I read that correctly?

10  A.  Yes, that's what it says.

11  Q.  And here is says:  Non-publication request.  And the

12  words say:  Yes.

13        Is that correct?  Did I read that correctly?

14  A.  Yes, you did.

15  Q.  So when a -- when an inventor requests a

16  non-publication, that application is not made public, true?

17  A.  That's the intent, but that was not what happened here.

18  Q.  Okay.  So you -- you believe that the -- the --

19  the application for the '066 patent was made public even

20  though you made a request that it not be public on September

21  22nd, 2014; is that your testimony?

22  A.  There's two parts to that question.  My testimony is

23  that there was -- we did not make a non-publication request,

24  but this was an error that has been brought to my attention

25  previously.  And so it turned out it was eventually

1  published, as were the '749 and '282 patents here.

2  Q.  And so you're -- you're testifying this was an error by

3  the Patent Office?

4  A.  No, sir.  I don't know who made the error, but there was

5  no intent.  And I'm not aware of any request that was

6  entered to not publish a patent application.

7  Q.  Okay.  Well, regardless, the '066 patent was issued on

8  June 9th of 2015, true?

9  A.  Yes, sir.

10  Q.  Now, would you agree with me that the '066 patent was

11  the first patent that you had ever been named an

12  inventor?

13  A.  No, sir.

14  Q.  Okay.  And -- and let me narrow that down.

15        An inventor on water balloons, was this the first

16  time you'd been an -- named an inventor on a patent related

17  to filling water balloons?

18  A.  Yes, sir.

19  Q.  Okay.  And there were no other patents related to

20  filling water balloons prior to June 2015; is that right?

21  That -- where you were the named inventor?

22  A.  Can you repeat the question?

23  Q.  Certainly.

24        There are no other patents that were issued prior

25  to June 2015 where you're the named inventor that cover

1  Bunch O Balloons; is that true?

2  A.  That's true.

3  Q.  Okay.

4       MR. LOVE:  Now, let's look at PTX-58.2.

5  Q.  (By Mr. Love)  You've seen this letter before, haven't

6  you?

7  A.  That's correct.

8       MR. LOVE:  And let's look at Page 2.

9  Q.  (By Mr. Love)  It's signed by Johanna Ruiz Bejarano.

10 And it's -- she's listed as in-house counsel at ZURU.  Did I

11 read that correctly?

12 A.  Yeah, she goes by Johanna or Johanna.

13 Q.  Okay.

14      MR. LOVE:  Now, let's go to Page 1.

15 Q.  (By Mr. Love)  And let's look at the third full

16 paragraph where it says:  ZURU owns substantial intellectual

17 property for Bunch O Balloons inclusive -- inclusive of

18 trademarks, patents, and copyrights over multiple countries.

19      Did I read that?

20 A.  Yes.

21 Q.  Now, do you understand this letter to be a letter from

22 ZURU to Telebrands telling Telebrands to cease and desist

23 selling its Balloon Bonanza product?

24 A.  Yes.

25 Q.  Okay.  And you also understand that this letter was sent

1  from ZURU's in-house counsel to Telebrands in December of

2  2014, true?

3  A.  Yes.

4  Q.  Now, let's focus on the word here "patents."

5        ZURU owns substantial intellectual property for

6  Bunch O Balloons inclusive of trademarks, patents, and

7  copyrights.

8        I read that correctly?

9  A.  Yes, sir.

10  Q.  In December of 2014, you hadn't signed any patent to

11  ZURU that cover Bunch O Balloons, had you?

12  A.  That's not correct.  We -- the license agreement was

13  from August of the same month.

14  Q.  I didn't ask about a license agreement, sir.  I asked

15  about a patent.

16  A.  Yes, sir, the -- the license included all the patents.

17  Q.  You didn't have a patent that covered Bunch O Balloons

18  in December of 2014, an issued patent, did you?

19  A.  Right.  It was still pending because it issued, as you

20  mentioned, in June of 2015.

21  Q.  About seven months later, right?

22  A.  Yes, sir.

23  Q.  So if ZURU's in-house counsel sent this letter to

24  Telebrands representing that it had patents that covered

25  Bunch O Balloons, that is false, true?

1  A.  I -- I don't understand the confusion.

2  Q.  Okay.  Well, until you have a patent, you don't have an

3  ownership interest in the claims of a patent, because it

4  hadn't been issued, right?

5  A.  That sounds like a legal conclusion.

6  Q.  I see.

7        Well, the bottom line is:  In December of 2014, you

8  had no issued patent in your name that covered Bunch O

9  Balloons, true?

10 A.  True.  It had not issued at that time.

11       MR. DUNLAP:  Your Honor, I'm going to object.  He's

12 asking the same question over and over again.

13       THE COURT:  Hold on.  I'm going to -- I'm going to

14 permit you to ask the question.

15       MR. LOVE:  Thank you, Your Honor.

16       THE COURT:  Overruled.

17 Q.  (By Mr. Love)  Now, let's -- let's talk about the '749

18 patent real quickly.

19       You filed the application that eventually became

20 the '749 patent on May 28th of 2015; is that correct?

21 A.  The -- the filing date is February 7th of 2014, or the

22 priority date is.

23 Q.  Okay.

24       MR. LOVE:  Well, let's look at PTX-34.

25 Q.  (By Mr. Love)  And we can see that this is part of the

1  file history.  I believe it's Page 1 of your application.

2          And we can see the words "filing date" highlighted

3  on PTX-34; do you see those words?

4  A.  Yes, sir.

5  Q.  And it says 28 May of 2015.  That's what it says on this

6  document, correct?

7  A.  It does.

8  Q.  Now, is this another error by the Patent Office?

9  A.  No, sir.

10 Q.  Okay.

11 A.  I -- I just want to clarify, there was -- I -- I'm not

12 aware of -- I didn't testify that there was an error by the

13 Patent Office, but I think you mischaracterized my testimony

14 is all --

15         MR. LOVE:  And, Your Honor, I'm going to object to

16 the -- the non-responsive assertion of testimony without a

17 question.  And ask that the Court instruct the jury to

18 disregard that.

19         THE COURT:  I will instruct the jury to disregard

20 that.

21         Mr. Malone, it's just easier to confine your

22 responses to the -- to Mr. Love's questions.  Thank you.

23         MR. LOVE:  Now, let's look at PTX-34, Page 7.

24 Q.  (By Mr. Love)  And, again, we can see that you're the

25 named inventor.  I'm sorry, we can see an issue notification

1  of January 26, 2016, for application No. 14/723,953.  Do you

2  see that?

3  A.  I'd -- I'd like to try to find it in the binder just for

4  the context.

5  Q.  Okay.  Sure.

6  A.  Can you repeat the page -- page number?

7  Q.  It is PTX-34, Page 7 in the '749 file history.

8  A.  Would that be labeled 34.7, is that --

9  Q.  Yes.

10  A.  Do I have that right?

11  Q.  Yes, that's correct.

12        Have you found it yet?

13  A.  Yes, sir.

14  Q.  Okay.  And we can see that this -- this document refers

15  to the issue notification on the '749 patent; is that right?

16  A.  Yes, sir.

17  Q.  Okay.  And Brett Mangrum was your attorney, true?

18  A.  Correct.

19  Q.  And you had lawyers helping you file these patent

20  applications, correct?

21  A.  Yes, sir.

22  Q.  You were involved in the prosecution of the '749 patent,

23  weren't you?

24  A.  Yes, sir.

25        MR. LOVE:  Let's look at PTX-34.9.  I'm sorry,

```
 1    .749.

 2    Q.  (By Mr. Love)  And this is the --

 3          MR. LOVE:  I'm sorry, Page 9, excuse me.

 4    Q.  (By Mr. Love)  Do you have Page 9 in your binder?  Do

 5    you see it?

 6    A.  Yes, sir.

 7    Q.  Okay.  Now, notice of allowance for the '749 patent was

 8    issued on December 14th, 2015, according to PTX-34.9; is

 9    that true?

10    A.  Can -- can you repeat the question?  I'm a little lost

11    in the documents.

12    Q.  Yes, certainly, certainly.

13          There's a notification date.  If you look at the

14    top, and we're going to highlight it for you on the screen,

15    and it says:  December 14th, 2015.

16          And this office communication was communicated to

17    Brett Mangrum, your attorney.

18          Do you see the document on the screen?

19    A.  Yes, sir.

20    Q.  Okay.  And -- and that's on, I believe, Page 9 of your

21    binder that you're looking at, PTX-34.9.  Are you there?

22    A.  I see it.

23    Q.  Okay.  Now, let's look at PTX-34.11, it's two pages, if

24    you flip it.

25          And those are front and back pages, so pay
```

1   attention to that.

2           Are you there?

3   A.  Yes, sir.

4   Q.  Okay.  Now, PTX-34.11 is a note -- it's a detailed

5   action as part of a notice of allowance, true?

6           And I'll withdraw that question, Mr. Malone.

7           Maybe this will cut to the chase.  If we look at

8   Paragraph 2 or .2 in PTX-34.11, we can see that Claim 1 of

9   the -- what became the '749 patent was the only claim that

10  was allowed; is that true?

11  A.  I'm just -- I'm struggling a bit because I don't know --

12  I'm having trouble connecting the dates, and -- and I don't

13  know -- this says corrected notice of allowability.  It says

14  what it says, I just don't know if this was the final word

15  from the Patent Office or -- or what.

16  Q.  Okay.  Let me ask you this way:  If you look at the

17  screen --

18  A.  Sure.

19  Q.  Okay.  I'm going to read these words to you:  Claim 1 is

20  the only allowed claim.

21          Do you see those words?

22  A.  Yes, sir.

23  Q.  Did I read those words correctly?

24  A.  Yes, sir.

25  Q.  And those words come from PTX-34.11, do you agree?

1    A.  I don't know.  I'm sorry, I don't see the -- I'm --

2    where does it say --

3    Q.  It's in your binder.

4    A.  I'm lost, sorry.

5    Q.  Certainly.  And I'll just remind you that PTX is one of

6    your exhibits.

7    A.  There's no page number on this -- this sheet.

8    Q.  Correct.  That's the way that your attorneys gave it to

9    us.

10   A.  Can you repeat the question?

11   Q.  Certainly.  On the screen, I'm going to read the words

12   to you:  Claim 1 is the only allowed claim of the '749

13   patent.

14           Did I read those words correctly?  Claim 1 is the

15   only allowed claim.

16   A.  That's correct, yes, sir.

17   Q.  All right.  And this language relates to the '749 patent

18   application, true?

19   A.  Let me check.  It's the '953 application, which is --

20           THE COURT:  Mr. Love, it might help you if you just

21   show him where --

22           MR. LOVE:  Certainly.

23           THE COURT:  -- where in the binder you're referring

24   to.

25   Q.  (By Mr. Love)  Right here, No. 2.

1    A.  Okay.  I don't see the connection to the '749.  I'm

2    having to take your word for it that that's what this

3    relates to.

4    Q.  Okay.  Please do.  Please take my word for it, okay?

5    A.  Sure.

6    Q.  Now, the notice of allowance notified you that Claim 1

7    will be the only claim allowed in this application, true?

8    A.  That's what this says.

9    Q.  Okay.  Now, let's look at PTX-2, which is the actual

10   '749 patent that was issued.  And I want to look at Column

11   6, Line 35 through 39.

12           MR. LOVE:  And, Mr. Maurer, maybe it would be

13   faster if you helped Mr. Malone look through the binder.

14           Your Honor, can Mr. Malone -- Mr. Maurer help Mr.

15   Malone?

16           THE COURT:  Yes, he may.

17           MR. LOVE:  Okay.

18   Q.  (By Mr. Love)  And -- and if we can look at the screen,

19   I'll represent to you that what's on the screen is what I

20   just stated it was.

21   A.  Okay.  I'll accept your word for it.

22   Q.  Okay.  Thank you.

23           Now, what we can see here is what is claimed.  And

24   under Claim 1 we've highlighted:  A plurality of hollow

25   tubes, each hollow tube attached to the housing at a

1   respective one of the holes at the second end of the

2   housing.

3           Did I read that correctly?

4   A.  Yes, sir.

5   Q.  And then above that -- and this is what I want to focus

6   on:  Extending through a common face of the housing at a

7   second end.

8           Did I read that correctly?

9   A.  Yes, sir.

10  Q.  Okay.  Now, I want to talk about the '282 patent really

11  quickly.  You allege in this case, and the Defendants

12  stipulated that the '282 patent was infringed, correct?

13  A.  Could you repeat the question?  The screen disappeared,

14  and I got distracted.

15  Q.  Okay.  You also alleged in this case that the Defendants

16  infringe the '282 -- the claims of the '282 patent, right?

17  A.  Yes, sir.

18  Q.  And you -- you also understand that Defendants have

19  stipulated to infringement of the '282, as you alleged?

20  A.  I heard about that this morning, yes, sir.

21  Q.  Okay.

22          MR. LOVE:  Now, let's look at PTX-03, and that's

23  the '282 patent cover sheet.

24  Q.  (By Mr. Love)  And, again, PTX-03 -- 03 is a copy of the

25  patent, correct?

123

1  A.  Yes.

2  Q.  Of the '282 patent?

3  A.  Yes, sir.

4  Q.  And according to the '282 patent, you filed the

5  application on October 23rd of 2015; is that true?

6  A.  That's correct.

7  Q.  And you first learned of a Battle Balloons product in

8  December of 2015, true?

9  A.  Yes, sir.

10  Q.  So the '282 patent application was filed October 23rd,

11  2015, and you learned of Battle Balloons in December of

12  2015, true?

13  A.  Yes, sir.

14  Q.  And you learned -- you also learned about the spiral

15  design --

16          MR. LOVE:  Your Honor, may I approach?

17          THE COURT:  You may.

18  Q.  (By Mr. Love)  You also learned about the spiral design

19  that we can see on this model in December of 2015, true?

20  A.  Yes, sir.

21  Q.  On December 21st, 2015, you filed an amendment on the

22  '282 patent while it was in application, didn't you?

23  A.  I don't recall.

24  Q.  Okay.

25          MR. LOVE:  Well, let's look at PTX-32.154.

1    Q.  (By Mr. Love)  And, again, Mr. Malone, if you would like

2    to look with us all on the screen, it would save a lot of

3    time.

4           You see it?

5    A.  Yes.

6    Q.  Okay.  Now, the document that we're looking at, at the

7    bottom says -- we see the words "preliminary amendment."  Do

8    you see those words?

9    A.  Yes, sir.

10   Q.  And on the next page -- well, actually the next one, and

11   perhaps even the next one, we can see that it's signed by

12   your attorney, Brett Mangrum, on December 21st, 2015.  Did I

13   read that correctly?

14   A.  Yes, sir.

15          MR. LOVE:  Now, let's look at PTX-32.155.

16   Q.  (By Mr. Love)  We can see that according to this filing

17   by your attorney, you canceled Claims 1 through 30, true?

18   A.  Yes, sir.

19   Q.  And that was all of the claims that you had applied for

20   in the '282 application, true?

21   A.  I believe so.

22   Q.  And then you added new claims that we can see here that

23   are listed under Paragraph 31.  Do you see that?

24   A.  Yes, sir.

25   Q.  Now, the amendment added -- and we can see this claim

1    language here -- the 28 -- the claim language that you say

2    of the '282 covers the Battle Balloons products sold by

3    Telebrands, true?

4    A.  I believe -- yes, it -- yes, it would infringe this

5    claim, is my understanding.

6    Q.  Now, did you coordinate with ZURU when you had your

7    attorney make this amendment on December 21st of 2015?

8    A.  I -- I don't recall if we discussed this amendment.

9    Q.  Did you talk to Ms. Mowbray?

10   A.  I don't recall.

11   Q.  Did you talk to either Nick or Mat Mowbray about this

12   amendment that you made?

13   A.  It's -- not Nick.  It's possible I could -- I could have

14   spoken with Mat Mowbray, but I don't remember.

15   Q.  Okay.  Well, here's -- here's the question, Mr. Malone:

16   You amended the claims of the '282 in the application with

17   the motivation that those claims would cover Battle

18   Balloons, didn't you?

19   A.  I don't know about the motivation, but certainly I

20   believe it would cover Battle Balloons, yes, sir.

21   Q.  Okay.  And you had that belief at the time that you made

22   the amendment, true?

23   A.  I think so, yes.

24   Q.  And, in fact, you did such a good job of drafting those

25   claims, that the Defendants have had to stipulate to

```
 1  infringement of the '282 patent, correct?
 2  A.  My understanding that you've stipulated, that's --
 3  that's my understanding.
 4  Q.  Okay.  Now, you answered a couple of questions earlier
 5  about Donaldson and Saggio.  Do you recall that testimony,
 6  the direct testimony with your lawyer?
 7  A.  I do.
 8  Q.  And -- and those questions dealt with -- I think your
 9  testimony was that the Patent Office considered Donaldson
10  and Saggio, true?
11  A.  Yes, sir.
12  Q.  Now, tell the members of the jury what your
13  understanding of Donaldson -- as quickly as you can, what
14  Donaldson disclosed in relation to the claims at issue in
15  this case?
16          MR. DUNLAP:  And, Your Honor, could I just ask if
17  the witness has a copy of Donaldson so he can see it?
18          MR. LOVE:  I'm just asking his knowledge, Your
19  Honor.  I'm not -- not a recitation of the reference.  Just
20  his knowledge.
21          MR. DUNLAP:  Withdrawn, Your Honor.  He can -- if
22  he knows what it is.
23  Q.  (By Mr. Love)  You know what Donaldson is, don't you?
24  A.  Yes, sir.
25  Q.  You talked about it with Mr. Dunlap, didn't you?
```

1  A.  We -- we referenced it, yes, sir.

2  Q.  Yes, yes, you did.

3          And you said that -- and I want to make sure I got

4  this right, that the Patent Office considered Donaldson and

5  Saggio and issued your patents anyway; is that what you

6  testified to?

7  A.  Yes, sir.

8  Q.  Now, earlier, we also heard Mr. Findlay in voir dire

9  talk about the presumption of validity once a patent is

10  issued from the Patent Office; do you recall that?

11  A.  I'm not sure I recall that part.

12  Q.  Okay.  And that's fine.

13          The Patent Office isn't always right, is it?

14  A.  Not always, no, sir.

15  Q.  In fact, you have written for the website, IPWatchdog,

16  haven't you?

17  A.  Yes, sir.

18  Q.  And IPWatchdog is an online publication for people

19  interested in patent and intellectual property matters,

20  isn't it?

21  A.  You can say that, yes.

22  Q.  Okay.  And you have written about the Patent Office in

23  IPWatchdog, haven't you?

24  A.  Yes, sir.

25  Q.  In fact, as early as October 30th of this year, you

1   published an article in IPWatchdog, true?

2   A.  I think so.

3   Q.  And you performed an analysis in that article that there

4   was a defect rate of 85 percent at the Patent Office, true?

5   A.  An alleged defect rate, yes.

6   Q.  Well, let's --

7           MR. LOVE:  Your Honor, may I approach the witness?

8           THE COURT:  You may.

9   Q.  (By Mr. Love)  Mr. Malone, you've -- let's look at

10  this -- the front page of the article.

11          MR. DUNLAP:  Your Honor, can I see a copy of that,

12  please?

13          MR. LOVE:  Certainly.

14          MR. KOIDE:  It's not in the binders.

15          MR. DUNLAP:  It's not in the binders.

16          MR. LOVE:  Your Honor, would the Court --

17          THE COURT:  Yes, please.

18          MR. DUNLAP:  Your Honor, I don't believe this is --

19  this is not a trial exhibit, is it?  You've pre-admitted.

20          MR. LOVE:  No, it's not a trial exhibit.

21          MR. DUNLAP:  I'm going to object to this as

22  hearsay, Your Honor.

23          MR. LOVE:  I haven't introduced it, Your Honor.

24          THE COURT:  Okay.

25          MR. DUNLAP:  Okay.  I'll hold my objection until

1   then, thank you.

2   Q.  (By Mr. Love)  And, Mr. Malone, I just want to make sure

3   that -- that we're clear, October 30th, 2017, you wrote an

4   article for IPWatchdog, true?

5   A.  Yes, sir.

6   Q.  You wrote about the 85 percent defect rate?

7            MR. DUNLAP:  Now, Your Honor, I'm going to object

8   because he's reciting the article which he's essentially

9   putting the article in hearsay by reciting it.

10           MR. LOVE:  I haven't -- I'm not even looking at the

11  article.  I'm asking Mr. Malone a question directly.

12           THE COURT:  I'll allow it.  I mean, don't -- let's

13  don't read from the article, Mr. Love.

14           MR. LOVE:  Yes, sir.  Yes, sir.

15  Q.  (By Mr. Love)  Now, the question that I have, Mr.

16  Malone, is that you just said an alleged 85 percent defect

17  rate, true?

18  A.  Yes, sir.

19  Q.  In this article, you didn't say anything about alleged

20  85 percent defect rate, did you?

21  A.  I -- I don't recall the specific words.

22  Q.  You never used the words "alleged," did you?

23  A.  I don't recall.

24  Q.  Okay.

25           MR. LOVE:  Your Honor, I'm going to refresh the

```
 1  witness's recollection --

 2          THE COURT:  Very well.

 3          MR. LOVE:  -- with this document.

 4  Q.  (By Mr. Love)  Mr. Malone, if we look at the highlighted

 5  words here:  I ran a few simple queries in Docket Navigator.

 6          Did I read that correctly?

 7          MR. DUNLAP:  Now he's reading from the article,

 8  Your Honor.

 9          THE COURT:  Mr. Love, don't --

10          MR. DUNLAP:  I'm going to object.

11          THE COURT:  Don't do that, Mr. Love.

12          MR. LOVE:  Okay.

13          MR. DUNLAP:  Thank you, Your Honor.

14  Q.  (By Mr. Love)  Take a look at this portion right here.

15          Do the words "alleged" appear in that portion?

16  A.  No, sir.

17  Q.  And you would admit that the words "85 percent patent

18  defect rate" do appear in the article that you wrote; you --

19  you would agree with that, wouldn't you?

20  A.  Yes, yes.

21  Q.  Now, let's talk about Kickstarter real quickly.

22          You launched a Kickstarter campaign for the Bunch O

23  Balloons products, and we talked about that -- or Mr. Dunlap

24  talked about that with you in direct examination, true?

25  A.  Yes, sir.
```

1  Q.  And the approximate date of that was August 2014, is

2  that roughly the time period?

3  A.  Yes, July -- July and August.

4  Q.  July and August.

5  A.  2014.

6  Q.  Okay.  And according to your previous testimony, not in

7  here, but in other venues, the Kickstarter campaign is what

8  caused the Bunch O Balloons product to go viral on the web,

9  true?

10 A.  That's -- that's true, the Kickstarter campaign was the

11 vehicle, I think it was the -- the solution to the problem

12 was the big attraction to why it went viral.

13 Q.  Uh-huh.  But the Kickstarter campaign wasn't the first

14 time that you attempted to place this product out into the

15 open domain, true?

16 A.  I think it was.  I think that was the first time.

17 Q.  Okay.  Do you recall attending the New York Toy Fair in

18 February of 2014?

19 A.  Yes, sir.

20 Q.  Okay.  And at the February 2014 Toy Fair, you displayed

21 your product, correct?  Bunch O Balloons?

22 A.  Yes, sir.

23 Q.  February 2014 is many months before August of 2014,

24 true?

25 A.  Yes, of course.

1    Q.  Okay.  And at the Toy Fair in February of 2014, you

2    would agree with me that interests -- you weren't gaining

3    much traction in interest, true?

4    A.  No, not much traction.

5    Q.  So you do agree with me, you weren't gaining traction in

6    February of 2014 on Bunch O Balloons, true?

7    A.  Some traction, but not much.

8    Q.  In fact, the interest was, in your words, middle of the

9    road, right?

10   A.  That's fair, yes, sir.

11   Q.  And you also displayed Bunch O Balloons on your Google

12   account in February of 2014, true?

13   A.  Yes, sir.

14   Q.  And the video demonstrating the Bunch O Balloons on your

15   Google account, it didn't go viral, did it?

16   A.  No, sir.

17   Q.  In February of 2014; is that right?

18   A.  That's correct.

19   Q.  Now, during direct, you've skipped the part about the

20   February 2014 Toy Fair, didn't you?

21   A.  We didn't discuss it, that's correct.

22   Q.  Okay.  Now, one of the -- the reasons why you went to

23   the Toy Fair was to find a -- a manufacturing partner,

24   correct?

25   A.  Yes.

1  Q.  And you didn't find a manufacturing partner at the Toy

2  Fair in February of 2014, did you?

3  A.  I did not.  There were some manufacturing potential

4  partners there, but I -- I did not go with them for

5  manufacturing.  I went with ZURU.

6  Q.  Right.  And you went with ZURU in August of 2014; right?

7  A.  Correct.

8  Q.  And that was after Command Partners had began marketing

9  your product, true?

10  A.  It was the -- no, sir, that's not correct.

11  Q.  So Command Partners didn't start -- didn't start

12  marketing your product until after you partnered with ZURU?

13  A.  No, I'm sorry.  Maybe I misunderstood.

14  Q.  And maybe -- maybe it was a bad question.  Let's start

15  over.

16          You had the Toy Fair in February of 2014, true?

17  A.  Yes, sir.

18  Q.  Interest was middle of the road, right?

19  A.  Yes, sir.

20  Q.  You couldn't find traction?

21  A.  Some, but not much.

22  Q.  After the Toy Fair and -- and during the Toy Fair, you

23  could not find a manufacturing partner that you partnered up

24  with between February of 2014 and August of 2014, true?

25  A.  True.

1    Q.  And then, I want to make sure I understand what you're

2    saying, and it's my understanding that you contracted with

3    Command Partners between February of 2014 and August of

4    2014; is that a fair statement?

5    A.  Yes, I think it was April.

6    Q.  Okay.  So April of 2014, you contract with Command

7    Partners?

8    A.  Yes.

9    Q.  And Command Partners's job is to market Bunch O

10   Balloons, true?

11   A.  I would not describe it that way.

12   Q.  How would you describe it?

13   A.  They're a consultant to help with presenting the

14   Kickstarter campaign and setting it up.

15   Q.  Prior to partnering up with Command Partners, Bunch O

16   Balloons was not a commercial success; isn't that a fair

17   statement?

18   A.  That -- yes, sir, that's correct.

19   Q.  Is it fair to say that Command Partners, the marketing

20   firm, helped you obtain the media attention that you

21   received in August of 2014?

22   A.  They helped with the Kickstarter campaign, and the

23   response that Kickstarter, in turn, generated a lot of media

24   interest.

25   Q.  Well, the tag line on the Kickstarter campaign was, a

1  hundred balloons in less than one minute, true?

2  A.  Yes.

3  Q.  And the words "100 balloons in less than one minute" do

4  not appear in either of the patents-in-suit, true?

5  A.  That's correct.

6          MR. LOVE:  Your Honor, I pass the witness.

7          THE COURT:  Redirect?

8          MR. DUNLAP:  Very briefly, Your Honor.  Thank you.

9          Greg, here's your water.  Greg?

10                     REDIRECT EXAMINATION

11  BY MR. DUNLAP:

12  Q.  Mr. Malone, can you please turn to Plaintiffs' Trial

13  Exhibit 58?  I believe it's towards the front of the binder.

14  You found -- yeah.

15          And this is the letter Mr. Love showed you from

16  ZURU; is that correct?

17  A.  Yes.

18  Q.  Did you see this letter before ZURU sent it?

19  A.  No.  No, sir.

20  Q.  Did you have anything to do with this letter?

21  A.  Not that -- not the letter, but I think the next page,

22  it shows a filing receipt, because I actually mailed the

23  letter, but I didn't do -- anything to do with the drafting.

24  Q.  You didn't draft that letter; is that correct?

25  A.  Correct.  Correct.

1   Q.  And you also testified -- and I'll just have you turn to

2   PTX No. 2, please.  That's Plaintiffs' Trial Exhibit 2, the

3   '282 patent, I believe.  I'm sorry, I believe '282 is PTX-3.

4         So you indicated to Mr. Love that you amended this

5   patent; is that correct?

6   A.  Yes, sir.

7   Q.  Okay.  Were you breaking the law when you amended this

8   patent?

9   A.  No, sir.  That's part of the patent application process.

10  Q.  Okay.  Was this part of a family of patents?

11  A.  Yes, sir.

12  Q.  Okay.  Were you allowed to amend this patent?

13  A.  Yes, of course.

14  Q.  Okay.  Were you trying to steal Battle Balloons when you

15  amended this patent?

16         MR. LOVE:  Objection, Your Honor.  This is a

17  leading question.

18         THE COURT:  Mr. Dunlap --

19         MR. DUNLAP:  Okay.  It's withdrawn, Your Honor.

20  And, in fact, I'm done, Your Honor.

21         THE COURT:  Just rephrase it.

22         MR. DUNLAP:  Okay.

23  Q.  (By Mr. Dunlap)  Mr. Malone, when you amended this, what

24  was your intent with respect to the amendment?

25  A.  Yeah, I understand.  The intent is to set those boundary

1  lines like Mr. Underhill described to -- to the point where

2  I'm entitled to on the basis of my -- what my -- what I've

3  invented.  So we're asking the Patent Office to say is this

4  the proper boundary.  And in this case, they agreed with us.

5  Q.  And you saw the video in opening that Mr. Underhill

6  shared, with the fence and the fence got bigger.  Do you

7  remember that?

8  A.  Yes, sir.

9  Q.  And when you amended this '282 patent, did the fence get

10  bigger from your amendment?

11  A.  No.  In fact, we added a limitation that the balloons

12  have to touch each other before and after they're filled, so

13  it -- actually it's narrowing.  It's bringing the fence

14  lines in, so it's a hard -- it's a more stringent

15  requirement for the invention.

16  Q.  So your '282 amendment made the fence smaller; is that

17  what you're saying?

18  A.  At least -- at least one boundary it did, yes.

19          MR. DUNLAP:  I have no further questions.  Please

20  answer any follow-up questions Mr. Love has.

21          THE COURT:  Mr. Love.

22          MR. LOVE:  Briefly, Your Honor.

23                      RECROSS-EXAMINATION

24  BY MR. LOVE:

25  Q.  Mr. Malone, you -- you do understand that it's the claim

1  language in the patents-in-suit that define the boundary

2  lines of your patents, right?

3  A.   That is -- yes, sir, that's my understanding.

4  Q.   They define what's inside the fence, so to speak, and

5  what's outside the fence, correct?

6  A.   I'm comfortable with that analogy, yes.

7  Q.   Okay.  Now, during your direct examination, you talked

8  about how you were shocked, right?

9  A.   Yes.

10 Q.   How you had taken a punch in the gut, true?

11 A.   Yes.

12 Q.   And how you -- your trip to New York for the -- the

13 media campaign, you felt like what you saw in that

14 commercial took that away from you.  Is that what you wanted

15 to convey earlier?

16 A.   I'm not sure the relevance of the Today Show, but it

17 took away my -- my invention, my rights.

18 Q.   If the boundary lines are defined by the claim language

19 in the patents and that's what determines what products are

20 in play in this case, in terms of our liability, why is it

21 that you haven't said a single word about the claim language

22 of your patents?

23 A.   Dr. Kudrowitz is our -- is a toy expert, and he -- he

24 has the understanding.

25 Q.   But you're the inventor, though, correct?

1  A.  Oh, yes.

2  Q.  You're the one that had the ah-ha moment, true?

3  A.  Yes.

4  Q.  And you're the one that assisted or worked with your

5  counsel to draft the claim language to define the

6  boundaries, true?

7  A.  True.

8          MR. LOVE:  Pass the witness.

9          THE COURT:  Redirect?

10         MR. DUNLAP:  A moment, Your Honor.

11         THE COURT:  Yes.

12         MR. DUNLAP:  I'm just going to confer with Mr.

13 Findlay.

14         Very briefly, Your Honor.

15         THE COURT:  Okay.

16              FURTHER REDIRECT EXAMINATION

17 BY MR. DUNLAP:

18 Q.  Mr. Malone, you heard what Mr. Love obviously asked you,

19 and thanked you for answering those questions.

20         Why do you think Battle Balloons, the product you

21 have in front of you, infringes the '282 and '749 patents?

22 A.  It's inside the boundary lines.

23 Q.  Okay.

24 A.  It has -- it has all the limitations of the patent,

25 and -- I mean, of course, it -- it's -- it works -- it's

```
 1   exactly the same.  There's no difference here.  And the --
 2   the alleged spiral housing has no -- no effect.
 3   Q.  Well, let's look at the patent claim language of the
 4   '749.  Can you turn to the '749 patent?
 5          And Mr. Love talked about a first end and a second
 6   end.  Do you recall that?
 7   A.  Yes.
 8   Q.  Where's the first end of the Battle Balloons product?
 9   A.  Well, you can call this the first end where the water
10   goes in.
11   Q.  Okay.  And where's the second end?
12   A.  The second end is the other end where the tubes come
13   out.
14   Q.  All right.  Thank you, Mr. Malone.
15          MR. DUNLAP:  Nothing further, Your Honor.
16          THE COURT:  Mr. Love?
17          MR. LOVE:  Real brief -- real brief, Your Honor.
18                FURTHER RECROSS-EXAMINATION
19   BY MR. LOVE:
20   Q.  Mr. Malone --
21          MR. LOVE:  Your Honor, may I approach?
22          THE COURT:  You may.
23   Q.  (By Mr. Love)  On the model, I want you to show the jury
24   where the second end is.
25   A.  I really should defer to Dr. Kudrowitz to specifically
```

1   answer your question.

2   Q.  So when your counsel wants to know where the second end

3   is, you have no problem answering that question; is that

4   fair?

5   A.  In -- in general, the second end is opposite the --

6   gosh, that thing is heavy.

7   Q.  It's heavy.  It is heavy.

8   A.  It's opposite the first end.

9   Q.  Point to me -- point to the model, where is the second

10  end?

11  A.  This -- this end right here.

12  Q.  And where --

13  A.  This is the first end.  This is the second end.

14  Q.  And where does it start?

15  A.  Again, that's a question for Dr. Kudrowitz.

16  Q.  You're not qualified to answer that question?

17  A.  Correct.

18  Q.  You have -- where is the common face?

19  A.  The --

20  Q.  Is that another question for Mr. Kudrowitz?

21  A.  Yes, sir.  That's -- that's the question that he's

22  supposed to answer.  I'm not qualified.

23  Q.  Okay.  And isn't it true that you're the inventor of the

24  '282 and '749, yes?

25  A.  Oh, yes.  Yes.

```
 1   Q.  And you're not qualified to testify to those questions?

 2   A.  Well, I know it when I see it.

 3   Q.  Thank you.

 4             THE COURT:  Redirect?

 5             MR. DUNLAP:  One question, Your Honor.  I can do it

 6   from here.

 7             THE COURT:  That's fine.

 8             MR. DUNLAP:  If that's okay.

 9             THE COURT:  That's fine.

10                 FURTHER REDIRECT EXAMINATION

11   BY MR. DUNLAP:

12   Q.  Mr. Malone, you're not an attorney, are you?

13   A.  No, sir.

14   Q.  And who drafted the language in the '749 and '282

15   patents?

16   A.  Brett Mangrum, who's an attorney.

17   Q.  Okay.  Thank you, Mr. Malone.

18             MR. LOVE:  No further questions.

19             THE COURT:  Ladies and gentlemen of the jury, if

20   you have any questions for this witness, I would ask that

21   you pass them down at this time.  And if you don't have any

22   questions, just pass a blank piece of paper.

23             (Pause in proceedings.)

24             THE COURT:  You may step down, Mr. Malone --

25   Malone.
```

1           Ladies and gentlemen of the jury, it's been a very

2    long day.  I appreciate your patience and your attention and

3    your concentration.

4           We're going to recess at this time.  And as we do,

5    I'm going to remind you not to discuss the case with anyone

6    at all until all of the evidence has been presented and

7    you've been instructed on the law.

8           Likewise, again, don't do any independent

9    investigation about anything.  Your decision as to a verdict

10   in this case should be based solely on the evidence that

11   comes from the witness stand and the documents and other

12   evidence that is admitted into evidence.

13          So as I mentioned earlier, I'll ask you to be back

14   no later than 8:45 in the morning so that we can start

15   promptly at 9:00 o'clock.  And I look forward to seeing you

16   all in the morning, and I hope you have a nice evening.

17          COURT SECURITY OFFICER:  All rise for the jury.

18          (Jury out.)

19          THE COURT:  Okay.  You all may be seated.

20          And I'd like to see counsel at the bench.

21          (Bench conference.)

22          THE COURT:  Mr. Love.

23          MR. LOVE:  Yes, sir?

24          THE COURT:  I'm troubled by this exhibit, and I'm

25   not fussing at you, but this article is not about the PTO.

1   This article is about the PTAB.  And when you get over here,

2   all this information that is highlighted relates to PTAB

3   defects.

4         And so I don't quite know how Mr. Dunlap was going

5   to redirect his witness on that.  But I want you to know I

6   understand what happened here.  And if there's an

7   explanation for what occurred, I'm -- I'm more than happy to

8   hear it now.  But I think this article clearly refers to

9   what the PTAB does.

10        MR. LOVE:  Your Honor, the PTAB -- my -- my

11  understanding is the PTAB is a part of the Patent Office,

12  and that's --

13        THE COURT:  But it's not about the presumption of

14  validity, is it?  This -- this -- this article is about --

15  about the issuance of patents.  It's not about, you know,

16  what the -- what the defect rate is.

17        MR. LOVE:  Your Honor, once a patent is issued, a

18  presumption of validity attaches to it.  And the whole fight

19  is about whether or not the Patent Office got it right or

20  wrong in the context of -- of the claims.  And -- and the

21  references -- the prior art references.

22        THE COURT:  Right.

23        MR. LOVE:  And so that was the purpose of that line

24  of questioning.

25        THE COURT:  Okay.  Well, I guess my concern about

```
 1   it is, you know, I think everybody understands PTAB
 2   proceedings are not going to come into this trial.  And --
 3          MR. LOVE:  And that's why I didn't seek admission
 4   of that.
 5          THE COURT:  I understand.  I'm just -- I'm a little
 6   troubled by it.  I'm a little troubled by it, but I
 7   understand what you're -- what you're saying.
 8          MR. FINDLAY:  May I be heard on that, or will I
 9   violate your rule on the witness -- I'd like to be heard on
10   it.
11          THE COURT:  You may be heard on it.
12          MR. FINDLAY:  Thank you.
13          I -- I appreciate Your Honor's concern.  We had the
14   same one, and I think but for the fact that we had never
15   seen this before, we probably would have jumped up and said
16   something.
17          I do think we would like, at least, to think about
18   a possible instruction because the clear impression that
19   Mr. Love made, intentionally or not, was that Mr. Malone was
20   criticizing the PTO for how many times it grants a patent.
21   He's criticizing them --
22          THE COURT:  I -- I have to tell you, Mr. Love, I do
23   agree with -- with Mr. Findlay about that.  That was the
24   impression I was left with; and it was the impression that I
25   think the jury was left with.
```

1          And I'm -- don't misunderstand, I'm not accusing of

2    doing anything intentionally.

3          MR. LOVE:  I appreciate that.

4          THE COURT:  I know better than that about you, but

5    I'm troubled by it a little bit.  So I don't know if you've

6    got any further thoughts about it?

7          MR. LOVE:  Yes, if you --

8          THE COURT:  And I -- and I -- and I will tell you,

9    I have not read the whole document.

10         MR. LOVE:  Correct.

11         THE COURT:  So --

12         MR. LOVE:  The reference to 85 percent patent

13   defect rate according to PTO/PTAB.

14         THE COURT:  Right.

15         MR. LOVE:  That -- that was the point of the

16   examination.  And those are Mr. Malone's words, not -- not

17   mine.

18         THE COURT:  No, I understand.  I understand.

19         MR. LOVE:  And -- and so you're allowed to impeach

20   a witness with that witness's own words.

21         THE COURT:  There is absolutely no question, you're

22   allowed to do that.

23         And I -- but I think it was -- my concern is that

24   the document didn't actually say what you were suggesting in

25   your cross-examination it said.

1           MR. FINDLAY:  Would Your Honor entertain us putting

2   Mr. Malone -- putting Mr. Malone back on the stand briefly

3   tomorrow to address that issue to clarify the confusion that

4   I think --

5           THE COURT:  I want to go back and look at the

6   transcript and see if it reads the way I remember it.  It

7   may not.  But I'm -- I'm open to -- I'm open to, you know, a

8   curative instruction that you want to suggest.  I just --

9   I'm just being honest with you, I'm concerned about it,

10  Mr. Love.

11          MR. LOVE:  Yes, sir.

12          THE COURT:  I don't -- I don't think it's -- it's

13  not -- certainly not the end of the world.  We're going to

14  have other issues.

15          MR. DUNLAP:  Or maybe even a limiting instruction,

16  Your Honor, for the jury that says you shall not consider

17  the personal opinions of the litigants.

18          MR. LOVE:  Correct.  If I would have written this

19  article, I would agree with you.  I didn't choose the word

20  "PTO," and -- and the witness chose the word "PTO."

21          THE COURT:  I understand it also says PTAB.

22          MR. DUNLAP:  The title of the article --

23          MR. LOVE:  Certainly.

24          THE COURT:  But why don't you let me do this:  Let

25  me look at the whole article, and -- and -- and I'll think a

1  little more about.

2          Mr. Underhill.

3          MR. UNDERHILL:  Yes, sir.

4          THE COURT:  I counted five times you got up from

5  the counsel table.

6          MR. UNDERHILL:  Yes, sir.

7          THE COURT:  During the direct examination.

8          MR. UNDERHILL:  Yes, sir.

9          THE COURT:  And cross-examination of Mr. Malone.

10 And you went back to the gallery, and then you moved back,

11 and then you went back to the gallery, and then you moved

12 back.

13         MR. UNDERHILL:  Sir --

14         THE COURT:  I am not going to permit that --

15         MR. UNDERHILL:  Sir --

16         THE COURT:  -- in this trial.

17         MR. UNDERHILL:  I have a medical issue.  I have to

18 go to the bathroom.  I'm going out to urinate.

19         THE COURT:  I have no -- okay.

20         MR. UNDERHILL:  And when I come back in, I don't

21 want to disturb things, so I sit in the gallery.  That's

22 what I'm doing.

23         THE COURT:  Okay.  Okay.

24         MR. UNDERHILL:  I'm sorry.

25         THE COURT:  Oh, well, I understand that, and I

1    appreciate that explanation.  But I -- I didn't see you go

2    out every time.

3            MR. UNDERHILL:  I did every single time.

4            THE COURT:  Okay.

5            MR. UNDERHILL:  Yeah.

6            THE COURT:  Then -- then we're not going to have

7    any problem.

8            MR. UNDERHILL:  Thank you.

9            THE COURT:  But I am going to fuss at you about

10   trying to direct the other lawyers to do their jobs.

11           MR. UNDERHILL:  Yes, sir.  Yes, sir.

12           THE COURT:  That, I will not permit.

13           MR. UNDERHILL:  Yes, sir.

14           THE COURT:  Okay.  I'm not going to get to a rule

15   where I require you to communicate with your co-counsel on

16   paper; but if that continues, I will get there.

17           MR. UNDERHILL:  I understand, sir.

18           THE COURT:  Okay.  Final thing, if there are

19   disputes about a -- demonstratives or anything like that,

20   any slides to be used with witnesses tomorrow, I would ask

21   that you provide those by email to us so that we'll have an

22   opportunity to look at those before we start in the morning.

23           MR. UNDERHILL:  Yes, Your Honor.

24           MR. DUNLAP:  Yes, Your Honor.

25           MR. LOVE:  Yes, Your Honor.

1          THE COURT:  Okay.  Any other questions?

2          MR. FINDLAY:  Not from Plaintiff.

3          MR. DUNLAP:  No, sir.

4          MR. LOVE:  No, Your Honor.

5          THE COURT:  All right.  Thank you all very much.

6          COURT SECURITY OFFICER:  All rise.

7          (Court in recess.)

8

9                      CERTIFICATION

10

11          I HEREBY CERTIFY that the foregoing is a

12  true and correct transcript from the stenographic notes of

13  the proceedings in the above-entitled matter to the best of

14  my ability.

15
    /s/ Shelly Holmes
16  SHELLY HOLMES, CSR, TCRR            November 14, 2017
    Official Court Reporter
17  State of Texas No.:  7804
    Expiration Date  12/31/18
18

19

20

21

22

23

24

25